**RELIANCE ELECTRIC COMPANY, et al., Appellants,**

v.

**CONSUMER PRODUCT SAFETY COMMISSION, et al.**

No. 89–5396.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1990.

Decided Jan. 22, 1991.

Peter L. Winik, with whom Robert M. Sussman, Washington, D.C., was on the brief, for appellants.

Jay I. Bratt, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., John R. Fleder, Director, Office of Consumer Litigation, Dept. of Justice, and Alan C. Shakin, Asst. Gen. Counsel, U.S. Consumer Product Safety Com'n, were on the brief, for appellees.

Before WALD, Chief Judge, D.H. GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Appellants sought an injunction to prevent the Consumer Product Safety Commission from disclosing certain documents requested under the Freedom of Information Act (FOIA) (5 U.S.C. § 552). The Commission developed and gathered these documents during its inconclusive investigation of circuit breakers manufactured by appellants' subsidiary. On cross motions for summary judgment, the district court sustained several of appellants' claims, but in a portion of its order challenged on appeal, the court permitted the Commission to release approximately 500 pages of information over appellants' objections. We affirm in part and vacate and remand in part.

## I

The Consumer Product Safety Act empowers the Commission to investigate the safety of consumer products, 15 U.S.C. § 2054(b), and to ban products it finds hazardous, 15 U.S.C. § 2057. The Act "gave the Commission broad powers to gather, analyze, and disseminate vast amounts of private information." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 111, 100 S.Ct. 2051, 2057, 64 L.Ed.2d 766 (1980). In order to protect manufacturers of consumer products, section 6 of the Act, 15 U.S.C. § 2055, restricts the Commission's authority to disclose information gathered during its investigations. Section 6(b)(1), with which we deal here, applies whenever the Commission plans to release data on its own initiative or

in response to a FOIA request. *See GTE Sylvania, Inc.,* 447 U.S. at 105, 122, 100 S.Ct. at 2054, 2063. It requires the Commission to notify manufacturers at least 30 days before disclosing information relating to their products; during that period, the manufacturer is entitled to submit comments to the Commission about the information. 15 U.S.C. § 2055(b)(1). Section 6(b)(1) further requires that the Commission "take reasonable steps to assure" (1) that the information is "accurate," (2) that disclosure will be "fair in the circumstances," and (3) that disclosure will be "reasonably related to effectuating the purposes of" the Act. *Id.* In this manner Congress sought to guard against the Commission's destroying a manufacturer's reputation by releasing inaccurate and unfair information about the company's product. *See GTE Sylvania, Inc.,* 447 U.S. at 110–11, 100 S.Ct. at 2057. The Commission has implemented these statutory requirements through regulations. 16 C.F.R. Part 1101 (1989).

This case concerns information compiled during the Commission's investigation of residential circuit breakers manufactured by Federal Pacific Electric Company, formerly a subsidiary of appellant Reliance Electric Company and now a part of appellant Challenger Electric Equipment Corporation. Circuit breakers prevent fires by interrupting the flow of electrical current when wiring overheats or when demand for current exceeds a circuit's capacity. In 1980, after discovering that Federal Pacific's "Stab–Lok" circuit breakers did not fully meet the safety standards of Underwriters Laboratories, Reliance notified the Commission as the Act required. 15 U.S.C. § 2064(b). The Commission then opened an investigation.

During the next two years, the investigation generated a substantial amount of technical information consisting of raw data, explanatory memoranda and analyses of test results. A large portion of this material was preliminary in nature and rested on hypotheses Reliance contested. For its part, Reliance supplied the Commission with its own test results and other

data to show that the circuit breakers were safe for residential use.

On March 3, 1983, the Commission announced its decision to close the investigation. The Commission's press release, set forth fully in the appendix to this opinion, stated that it could not, at that time, link the circuit breakers with "a serious risk of injury to consumers." The Commission also noted that it could not reach any firm conclusions unless it conducted a further probe and that it was unwilling to expend its limited funds for this purpose in view of the "uncertainty of the results."

The present controversy arose in 1984, when the Commission received several FOIA requests for agency records compiled during the Commission's investigation of Federal Pacific's circuit breakers. As section 6(b)(1) required, the Commission notified Reliance of its intention to release these records. Reliance objected and submitted a 120–page memorandum expressing its views. Reliance claimed that some documents should not be disclosed because they contained trade secrets (15 U.S.C. § 2055(a)(2)) or data submitted to the Commission in confidence under section 15(b) of the Act (15 U.S.C. § 2064(b)), or because they were within certain FOIA exemptions (5 U.S.C. § 552(b)(5) & (7)(B)). Reliance also resisted disclosure on section 6(b)(1) grounds, claiming that the Commission's information was inaccurate or that its dissemination would be unfair to Reliance and would not advance the Act's purposes.

Two and one-half years after receiving Reliance's detailed submission, the Commission responded in an eight-page letter. The Commission concurred with many of Reliance's claims. With respect to the bulk of Reliance's section 6(b)(1) objections, however, the Commission announced its decision to disclose the disputed information. The Commission added that, in order to assure fairness it would provide the recipients of the documents with a copy of its 1983 press release and an explanatory statement mentioning some of Reliance's claims.

Reliance's memorandum, the Commission's letter to Reliance, and the disputed information are under seal and our description must therefore be couched in general terms. The information itself consisted of many highly-technical reports, raw data, engineering staff memoranda, mathematical models and the like. With respect to many, but not all, of these items Reliance had interposed an objection based on their alleged inaccuracy within the meaning of section 6(b)(1) of the Act. Rather than explaining why it considered the documents accurate, however, the Commission simply treated Reliance's objections as if the company were concerned solely with the fairness of releasing this material. On that score, the Commission concluded, again without explanation, that disclosure would not be unfair in view of the press release and an explanatory statement the Commission proposed to give to the FOIA requesters. The Commission also noted that Reliance could authorize the Commission to provide Reliance's test data to these individuals if it wished.

Appellants brought this action in district court pursuant to section 6(b)(3) of the Act, 15 U.S.C. § 2055(b)(3), which authorizes suits for injunctions against the Commission's dissemination of information. They claimed, among other things, that the Commission's decision should be set aside as arbitrary and capricious or that the district court should consider *de novo* whether disclosure would be consistent with the Act and FOIA. On cross motions for summary judgment, the district court refused to conduct a *de novo* review, but enjoined the Commission from disclosing approximately 120 pages of material the court found to be within section 6(b)(5), 15 U.S.C. § 2055(b)(5), which generally prohibits the Commission from releasing information submitted by a manufacturer pursuant to section 15(b).

With respect to the remaining documents, the court rejected appellants' section 6(b)(1) claims and sustained the Commission's decision to disclose these items. The court disagreed that the Commission had, in its 1983 press release, rejected preliminary findings and conclusions in staff memoranda, thereby rendering those find-

ings and conclusions inaccurate. Although Reliance had presented test data that conflicted with the results of the Commission's tests, the court ruled that under the Commission's regulations the proper course was to release the Commission's information with an explanation noting the manufacturer's objection. The court also found that disclosure would be, in the language of section 6(b)(1), "fair in the circumstances" because the Commission's press release and its proposed explanatory statement would place the information in an appropriate light. The court stayed its order pending appeal.[1]

## II

■ Agency decisions to release information in compliance with a FOIA request are informal adjudications. *Chrysler Corp. v. Brown,* 441 U.S. 281, 287, 317–18, 99 S.Ct. 1705, 1710, 1725–26, 60 L.Ed.2d 208 (1979). We held in *Occidental Petroleum Corp. v. SEC,* 873 F.2d 325 (D.C.Cir. 1989), another reverse-FOIA action, that judicial review of these informal adjudications is pursuant to section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, which in relevant part provides that agency action will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). *Occidental,* 873 F.2d at 337; *see also AT & T Information–Systems, Inc. v. General Services Admin.,* 810 F.2d 1233, 1236 (D.C.Cir.1987). A court cannot, however, properly perform such review unless the agency has explained the reasons for its decision. *See Public Media Center v. FCC,* 587 F.2d 1322, 1331–32 (D.C.Cir. 1978). If the court supplied the explanation, it would be performing the agency's function rather than reviewing the agency's decision. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).

As we held in *Occidental,* the agency therefore "must produce an administrative record that delineates the path by which it reached its decision." 873 F.2d at 338. When the agency has not done so, the proper course is to vacate and remand for an explanation. *Id.* at 338, citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985), and *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). These principles control our decision here.

Reliance's main argument is that the administrative record is inadequate because it does not reveal whether the Commission has taken reasonable steps to assure accuracy. For this reason, Reliance urges a remand of the case to the agency. The Commission protests that Reliance never made this argument in the district court, but the record below shows otherwise. Reliance argued in its memorandum in support of summary judgment and elsewhere that the Commission had not explained the reasons for its rejection of the company's accuracy objections. As authority for the proposition that the Commission was required to do so, Reliance invoked *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Burlington Truck Lines,* 371 U.S. 156, 83 S.Ct. 239, and other decisions vacating agency actions on similar grounds. It is true that the district court did not, in so many words, discuss the adequacy of the administrative record. But the issue was sufficiently raised and the court did cite *Occidental,* which is closely on point.

The Commission recognizes that there is a difference between accuracy and fairness under section 6(b)(1). "Accuracy" connotes conformity to a standard, freedom from error or mistake. But even if a document

---

**1.** The portion of the district court's order from which appellants have appealed sustained the Commission's decision to disclose the following pages of documents from the administrative record, which are reproduced in Exhibit C of the appellants' complaint and in the Joint Appendix filed with this court: 2–81 to 2–90; 5–10 to 5–16; 5–17 to 5–65; 5–66 to 5–123; 5–124 to 5–131; 5–132 to 5–136; 5–137 to 5–306; 7–11 to 7–14; 7–15 to 7–22; 7–23 to 7–48; 7–53 to 7–62; 7–79 to 7–88; 7–140 to 7–234; 7–241 to 7–246; 7–254 to 7–258; 20–1 to 20–20; and 21–1 to 21–18. (Although the court listed "7–140 to 7–234," it appears that Exhibit C does not include as part of the administrative record any material numbered 7–142 to 7–149.)

**278**

is "accurate," it might be "unfair" to release it. To paraphrase Mark Twain, sometimes the surest way to convey misinformation is to tell the strict truth. The Commission's "reasonable steps to assure" accuracy are therefore not the same as its "reasonable steps to assure" fairness. In determining accuracy the Commission seeks to verify the information. *See* 16 C.F.R. § 1101.32(a)(3). If it cannot do so, the information may not be disclosed. The Commission puts it this way: it "will not disclose undocumented or unsupported information, information refuted by other information in the Commission files, or information rejected by the Commission itself" (48 Fed.Reg. 57,406, 57,415 (1983)); and "it will often be inappropriate to disclose information when comments and supporting documents specifically call into question the accuracy of information" (*id.* at 57,416).

As to "fairness," the Commission may itself make adjustments for the purpose of influencing "the circumstances" of disclosure. As one of its "reasonable steps to assure" fairness, for example, the Commission can issue "an explanatory statement that places the information in the proper context" and thereby "minimizes the potential that someone might draw misleading or erroneous conclusions from the data in a manner which might make disclosure unfair." *Id.* at 57,421.

■ With respect to each of the documents listed in the margin, Reliance disputed the accuracy of the information they

contained.[2] The Commission's counsel claimed at oral argument that the Commission must have reviewed these documents for accuracy because the Commission withheld other information on the ground that it was inaccurate. But the Commission's letter did not explain why Reliance's accuracy objections with respect to these documents were not well-taken.

Reliance objected to disclosure of memoranda and data prepared by the Commission's engineering staff early in the investigation, which is contained at pages 5–10 to 5–16; 5–17 to 5–123; 7–241; 7–242; and 7–246 of the administrative record. Reliance claimed that this material, which totals about 100 pages, contains "information rejected by the Commission itself" (48 Fed. Reg. at 57,415) and therefore could not be considered "accurate." The information consisted of findings and conclusions about the safety of Federal Pacific's circuit breakers. Reliance believed that the Commission, in its March 3, 1983, press release, rejected those findings and conclusions by reporting that "the data currently available to the Commission does not establish that the circuit breakers present a serious risk of injury to consumers." Joint Appendix ("J.A.") 6. The district court disagreed on the basis that the Commission, in its press release, had not rejected earlier findings, but merely had stated that it had insufficient data to make any findings.

However persuasive the district court's reasoning may be, it is not the Commis-

---

2. Of the documents listed in the district court's order (note 1, *supra*), Reliance's letter to the Commission interposed accuracy objections with respect to the documents at pages 5–10 to 5–16; 5–17 to 5–123; 5–124 to 5–131; 5–132 to 5–136; 5–137 to 5–306; 7–15 to 7–48; 7–53 to 7–62; 7–140; 7–141; 7–150 to 7–153; 7–170 to 7–234; 7–241 to 7–246; 20–1 to 20–20; and 21–1 to 21–18.

With respect to the remaining documents listed in the district court's order, Reliance's letter cited pages 2–81 to 2–82 among the documents it contended would be unfair to disclose. But Reliance did not inform the Commission why this would be unfair. In this court appellants have not explained the nature of Reliance's objections to these documents; so far as we can tell, they did not do so in the district court. We therefore decline to review the district court's order regarding these pages. *See McBride v.*

*Merrell Dow & Pharmaceuticals, Inc.,* 800 F.2d 1208, 1210–11 (D.C.Cir.1986); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983), quoting Fed.R.App.P. 28(a)(4); *Railway Labor Executives' Ass'n v. U.S. Railroad Retirement Board,* 749 F.2d 856, 859 n. 6 (D.C.Cir.1984).

With respect to pages 2–83 to 2–90; 7–11 to 7–14; 7–79 to 7–88; 7–154 to 7–169; and 7–254 to 7–258, Reliance's letter objected solely on the basis of exemptions 5 and 7(B) of the Freedom of Information Act, 5 U.S.C. § 552(b)(5) & (7)(B). In this court, appellants have not mounted any argument, in their briefs or in their oral presentation, regarding why the Commission should have invoked these FOIA exemptions or why the Commission's refusal to do so should be set aside. We therefore shall not review that portion of the district court's order upholding the Commission's decision to release these documents.

sion's. At no point did the Commission explain why it considered the engineering staff's memoranda and data "accurate" within the meaning of section 6(b)(1). The Commission said only that releasing the material would not be "unfair" in light of the press release announcing the close of the investigation. J.A. 666 (¶ G). But, as we noted earlier, the question of accuracy is distinct from the question of fairness under the Act and the Commission's regulations. What steps the Commission took to verify the factual assertions in these memoranda and the reasons why the Commission was assured of their accuracy, if it was, cannot be determined on this record.

Reliance also disputed the accuracy of a 64-page document (at pages 7-170 to 7-234) in which Commission staff developed scenarios regarding the risk of fires if a circuit breaker does not trip. Reliance claimed that the scenarios contained inaccurate statements, reflected untested speculation and were refuted by the results of other tests conducted during the Commission's investigation. In its letter, the Commission simply stated that it would release the scenarios over Reliance's "fairness" objection because they merely reflected hypotheses. J.A. 668 (¶ Q). Whether the Commission ever considered Reliance's complaint about the accuracy of this document, as distinguished from the fairness of releasing it, is impossible to determine on this record. Still less can we ascertain why, if the Commission did consider the company's objection, it disagreed with Reliance. The Commission's mention of the theoretical nature of the scenarios may be a clue to its reasoning, but an administrative record should not read like a detective mystery. If the Commission intended to reject Reliance's argument on the ground that anything which is labelled a hypothesis cannot be inaccurate, the Commission should have said precisely that.

Reliance objected to the release of other information on different "accuracy" grounds. It contended, for instance, that a document describing a mathematical model used to simulate the overheating of electrical cables in walls (at pages 5-132 to 5-136) and some preliminary findings derived therefrom (at pages 5-289 to 5-306) should be withheld because the Commission could not be assured of the model's predictive power. The Commission merely stated that the model and findings were "hypothetical." J.A. 667 (¶ I). At oral argument, counsel for the Commission argued that the Commission intended to reject Reliance's objection on the ground that something identified as a "hypothetical" cannot be challenged as inaccurate. The idea apparently is that even an ill-designed mathematical model yields "accurate" information when the computations are done correctly. But if that was the Commission's thinking, it should have said so in its letter. Our duty is to review the Commission's reasoning, not its counsel's.

Reliance objected to the Commission's releasing a draft report describing the operation of circuit breakers, at pages 7-23 to 7-48 of the administrative record. While the company admitted that the report was "generally accurate," Reliance claimed that one sentence on page 7-35 was in error. The Commission responded by stating that it would explain the sentence in a cover letter when it disclosed the draft report. But under the Commission's regulations, inaccuracy cannot be cured through explanations. 16 C.F.R. § 1101.31(c). Thus, the Commission has yet to explain why this sentence is accurate, if the Commission so believes, and why the sentence should not be withheld when the report is released, as Reliance requested.

Reliance's objection to pages 20-1 to 20-20, which consist of a master index of documents generated during the investigation, deserves special mention. Reliance listed these pages among the other accuracy objections, but the company's substantive comments said only that the index, because of the titles assigned to the documents, was "misleading" and unfair to disclose. We cannot tell whether the Commission believed that the document titles, while possibly misleading, were nevertheless accurate. The Commission merely stated that, in light of the press release, disclosure of the index would not be unfair. Without a better understanding of why the

Commission rejected Reliance's request to withhold the index, the court cannot proceed to the merits of the Commission's disclosure decision.

The balance of Reliance's "accuracy" objections challenged data derived from various tests, including "calibration tests," at pages 5–124 to 5–131; 5–137 to 5–288; 7–15 to 7–22; 7–53 to 7–62; and 7–150 to 7–153. Calibration tests are described in the Commission's 1983 press release as tests for determining "whether the circuit breakers will hold the current for which they are rated and also automatically open or 'trip' (shut off the current) within specified time limits if over-loading of the circuit causes current levels in excess of the breaker's amperage rating." Reliance opposed release of the Commission's calibration test data on the ground that the Commission's tests did not simulate actual household conditions and, thus, did not accurately measure the safety of its product.

The district court ruled that the Commission's decision to disclose this information was consistent with its regulations. That is, under the regulations, results from tests having indicia of reliability, even though superseded or contradicted by later tests, may be disclosed with an explanatory statement noting the manufacturer's objection. *See* 48 Fed.Reg. at 57,415–16. The district court's reasoning may correctly reflect the Commission's thinking. But we have no way of knowing. Nowhere in its letter did the Commission address Reliance's accuracy objections. The Commission merely re-

cited that it would not be "unfair" to release the material. J.A. 667 (¶¶ H, M & P). The Commission is certainly entitled to invoke its regulations and the definition of "accuracy" contained therein in deciding whether to release information. But it must do so on the record. It is the Commission's duty, not the court's, to explain why the Commission acted as it did.

As we discussed earlier, if Reliance is correct that the information involved in this case should be considered inaccurate, the Commission could not release it even with the explanatory statements it proposed in its response. The Commission itself recognizes that such statements are "not a substitute for, taking reasonable steps to assure the accuracy of information." 16 C.F.R. § 1101.31(c). For these reasons, when the Commission decides to release information despite a manufacturer's objection that the information is inaccurate, the Commission must explain why the objection is not well-taken. If the Commission has complied with section 6(b)(1) by taking "reasonable steps to assure" the accuracy of the information, it must reveal what it has done. It never did so in regard to the documents Reliance claimed to be inaccurate.[3]

We therefore vacate the portion of the district court's order permitting the Commission to disclose pages 5–10 to 5–16; 5–17 to 5–123; 5–124 to 5–131; 5–132 to 5–136; 5–137 to 5–306; 7–15 to 7–22; 7–23 to 7–48; 7–53 to 7–62; 7–150 to 7–153;

---

3. With respect to the documents at pages 7–140, 7–141, 7–243 to 7–245, and 21–10 to 21–18, which are within the court's order, Reliance merely listed these pages in its letter to the Commission as among the documents it claimed to be inaccurate. At no point did Reliance tell the Commission why the documents were inaccurate, and in this court, appellants have not mentioned these documents let alone provided us with any argument about them. We will not speculate about why Reliance objected to disclosure and therefore shall decline to review the district court's order regarding these pages. *See McBride v. Merrell Dow & Pharmaceuticals, Inc.,* 800 F.2d 1208, 1210–11 (D.C.Cir.1986); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983), quoting Fed.R.App.P. 28(a)(4); *Railway Labor Executives' Ass'n v. U.S. Railroad Retirement Board,* 749 F.2d 856, 859 n. 6 (D.C.Cir.1984).

As to pages 21–1 to 21–9, which is an investigative report documenting a consumer complaint, Reliance's contention before the Commission was only that certain conclusions on page 21–5 were unsupported by any scientific or technical evaluation and therefore could not be disclosed under the Commission's regulations (48 Fed.Reg. 57,414 (1989)). The Commission accepted that rationale and agreed to withhold the page. Since Reliance raised no other objection to releasing these pages, we affirm the district court's order upholding the Commission's decision to disclose them.

Finally, it is not necessary to address Reliance's more general objections based on the purposes of the Act since the case must be remanded on other grounds.

7–170 to 7–234; 7–241; 7–242; 7–246; and 20–1 to 20–20. For the reasons stated by the district court, however, we reject appellants' argument that they are entitled to a trial *de novo*. Rather, with respect to the foregoing documents, the case shall be remanded to the district court with direction to remand the matter to the Commission. On remand, the Commission must explain why it believes appellants' accuracy objections are not well-taken, if it continues to adhere to that position.

*Affirmed in part and vacated and remanded in part.*

## APPENDIX

### NEWS FROM CPSC

U.S. Consumer Product Safety Commission

For Release: March 3, 1983

COMMISSION CLOSES INVESTIGATION OF FPE CIRCUIT BREAKERS AND PROVIDES SAFETY INFORMATION FOR CONSUMERS

WASHINGTON, D.C.—The Consumer Product Safety Commission announced today that it is closing its two year investigation into Federal Pacific Electric Stab-lok type residential circuit breakers. This action was taken because the data currently available to the Commission does not establish that the circuit breakers present a serious risk of injury to consumers.

The Commission investigation into Federal Pacific Electric (FPE) circuit breakers began in June, 1980, when Reliance Electric Co., a subsidiary of Exxon Corporation and the parent to FPE, reported to the Commission that many FPE circuit breakers did not fully comply with Underwriters Laboratories, Inc. (UL) requirements. Commission testing confirmed that these breakers fail certain UL calibration test requirements. The Commission investigation focused primarily on 2 pole residential circuit breakers manufactured before Reliance acquired FPE in 1979.

To meet UL standards, residential circuit breakers must pass a number of so-called "calibration tests." The purpose of these tests is to determine whether the circuit breakers will hold the current for which they are rated and also automatically open or "trip" (shut off the current) within specified time limits if over-loading of the circuit causes current levels in excess of the breaker's amperage rating. (Overloading can occur because a consumer plugs too many products into a circuit or due to the failure of a product or component connected to that circuit). While the Commission is concerned about the failure of these FPE breakers to meet UL calibration requirements, the Commission is unable at this time to link these failures to the development of a hazardous situation.

According to Reliance, failures of these FPE breakers to comply with certain UL calibration requirements do not create a hazard in the household environment. It is Reliance's position that FPE breakers will trip reliably at most overload levels unless the breakers have been operated in a repetitive, abusive manner that should not occur during residential use. Reliance maintains that, at those few overload levels where FPE breakers may fail to trip under realistic use conditions, currents will be too low to generate hazardous temperatures in household wiring. Reliance believes its position in this regard is supported by test data that is provided to the Commission.

The Commission staff believes that it currently has insufficient data to accept or refute Reliance's position.

The Commission staff estimates that it would cost several million dollars to gather the data necessary to assess fully whether those circuit breakers which are installed in homes but which may fail UL calibration tests present a risk to the public. Based on the Commission's limited budget ($34 million for fiscal year 1988), the known hazards the Commission has identified and must address (involving products of other manufacturers) and the uncertainty of the results of such a costly investigation, the Commission has decided not to commit further resources to its investigation of FPE's circuit breakers. However, despite its decision to close this particular investigation,

the Commission will continue its investigation of FPE circuit breakers if further information warrants.

The Commission advises consumers to take certain safety precautions with all circuit breakers and fuses. Consumers should:

—Know your electrical circuit. Know which outlets and products are connected to each circuit.

—Never overload any electrical circuit by connecting too many products to the circuit. Be particularly careful not to connect several products that demand high current (such as heating appliances) to a low amperage circuit.

—Comply with local building codes in wiring or adding electrical circuits. Make sure the wiring and devices used in the circuit are connected to a circuit breaker or fuse of the proper size.

—Immediately disconnect any electrical product if problems develop. Have the product examined by a competent repair person.

—Investigate to determine why a fuse blows or circuit breaker trips. Do not simply replace the fuse or reset the breaker. If a fuse blows or breaker trips, it is often a warning that the circuit is overloaded. Check the circuit for causes of overloading (for example, too many appliances plugged in, a malfunctioning product, a short circuit). When in doubt, consult a licensed electrician.

Consumers who have questions concerning circuit breakers, or who wish to report information relating to their safety, may call the U.S. Consumer Product Safety Commission's toll-free safety hotline at 800–638–CPSC, teletypewriter for the hearing impaired at 800–638–8270 (Maryland only 800–492–8104).