Opinion for the Court filed by Senior Circuit Judge RANDOLPH.
Dissenting opinion filed by Circuit Judge ROGERS.
RANDOLPH, Senior Circuit Judge.
I.
The issue in this appeal from the judgment of the district court arises from efforts of the Mechoopda Indian Tribe of Chico Ranchería in Butte County, California, to obtain federal approval to conduct gaming operations. The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, permits federally-recognized Indian tribes to conduct gaming on “Indian lands.” The *192 Act defines “Indian lands” to mean all lands within any Indian reservation and “any lands title to which is ... held in trust by the United States for the benefit of any Indian tribe....” Id. § 2703(4). Indian gaming is not permitted on “newly acquired lands”—that is, lands the Secretary of the Interior took into trust for a tribe after October 17, 1988, when the Act went into effect. An exception to this bar allows Indian gaming on lands the Secretary takes into trust after the 1988 date “as part of ... the restoration of lands for an Indian tribe that is restored to Federal recognition.” Id. § 2719(b)(l)(B)(iii).
The Mechoopda Tribe has been restored to federal recognition. The issue at the administrative level was whether land the Tribe purchased and offered to the Department of the Interior to take into trust for its benefit qualified as restored lands. The Act does not define “restoration of lands.” The Interior Department and the agency largely responsible for regulating Indian gaming—the National Indian Gaming Commission—believed that any lands “located within the areas historically occupied by the tribes are properly considered to be lands taken into trust as part of the restoration of lands.” Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney for W. Dist. of Mich., 46 F.Supp.2d 689, 701 (W.D.Mich.1999). Shortly after final agency action in this case, the Interior Department codified its view in regulations requiring, among other things, that a tribe “demonstrate a significant historical connection to the land.” 25 C.F.R. § 292.12(b).[1]
The Mechoopda Tribe had approximately 400 enrolled members when this case began. Most lived in or near what is now Chico, California, the largest city in Butte County in the north-central portion of the state. The Tribe traces its history to a “ranchería” in Chico. In 1849, John Bid-well, a wealthy California businessman and politician, purchased a 22,000-acre ranch and hired Indians to live and work there. When Bidwell died, he left the ranch to his wife. Between 1909 and 1918 Mrs. Bid-well conveyed 26 aeres of the ranch where the Indians were living—the “ranchería”— to a private board in trust for the Indians. The United States took over as trustee of the ranchería in 1939. Acting pursuant to the California Ranchería Act, Pub.L. No. 85-671 (1958), the government terminated the Mechoopda Tribe’s recognition in 1967 and ended the trust status of the land. See Notice of Termination, 32 Fed.Reg. 7981 (June 2,1967).
The Tribe brought a lawsuit contesting its termination. The suit ended when the government and the Tribe entered into a settlement agreement. As the settlement agreement provided, the government restored the Tribe to federal recognition in 1992. See Notice of Reinstatement, 57 Fed.Reg. 19,133 (May 4, 1992). The settlement agreement also forbade the Tribe from reestablishing the boundaries of the ranchería.
In 2001, the Tribe purchased a 645-acre parcel of land in Butte County. The Tribe’s plan was to have the government take the land in trust so that the Tribe could develop and operate a casino there. The parcel is located approximately 10 miles from the area of the former ranche-ría, which is in the center of the city of Chico. In addition to requesting the Secretary to take the parcel into trust for the Tribe’s benefit, the Tribe submitted appli *193 cations to the Gaming Commission for review of a gaming management contract and for approval of a gaming ordinance.
The matter was initially referred to the Office of the General Counsel for the Gaming Commission to prepare an advisory legal opinion on whether gaming on the land would be permissible—that is, whether the land, if taken into trust, would qualify under the restored lands exception. Relying on material the Tribe provided, Acting Deputy Counsel Coleman concluded that the Tribe had a “historical and cultural nexus” to the proposed gaming site that was “sufficient to show that the parcel was not merely an acquisition but a restoration of previously used lands.” Her conclusion rested, in part, on the fact that the proposed gaming site was within the boundaries of the Meehoopda villages before the Meehoopda relocated to the Bidwell ranch. Her memorandum also indicated that the proposed site was within land that was promised the Meehoopda by an unratified treaty of 1851. There was other evidence showing the historical and cultural significance of the land to the Meehoopda. The memorandum stated that the Interior Department’s Office of the Solicitor concurred in her conclusion.
Coleman’s memorandum was dated March 14, 2003. The Secretary did not make a final decision to take the land into trust until May 8, 2008. In the interim, on June 16, 2006, the attorney for Butte County wrote to the Secretary to dispute Coleman’s opinion. The County objected to Coleman’s conclusion that the Tribe had a historic connection to the gaming site. As the County saw it, the tribe that worked and lived on the Bidwell Ranch, and from whom the modern Tribe is descended, was not the same tribe as the historic tribe that had allegedly occupied the gaming site. Rather, the people residing at the ranch were a disparate group of Indians from many tribes. The County urged that the only land to which the tribal members could show a common connection was on the site of the former the Bidwell Ranch.
To support its assertions, the County attached a report prepared by its consultant, Dr. Stephen Dow Beckham, a professor of history at Lewis & Clark College. The report provided a history of the Bid-well Ranch and those who worked and resided there. Beckham cited the findings of a Bureau of Indian Affairs employee who visited the ranch in 1914. The BIA employee concluded that the Indians did not “belong to any particular band, but are remnants of various small bands, originally living in Butte and nearby counties.” Beckham’s report also included a detailed account of the families who resided at the ranch between 1928 and 1933. A significant number of these individuals belonged to a tribe interchangeably referred to as Michopda, Mishopda, or Mi-Cho-Da. While this is the historic tribe discussed in Coleman’s analysis, Beckham found that many of the ranch Indians were from other tribes—his report lists members of the Wailaki, Concow, Winton, Yuki, Pit River, and Sioux tribes. Why the Indians of the Bidwell Ranch ultimately assumed the name “Meehoopda”—presumably a variant of the “Michopda” tribe from which some of them were descended—is unclear.
The Acting Deputy Assistant Secretary for Policy and Economic Development responded to the County in a short rejection letter. The letter, dated August 28, 2006, stated: “[Y]ou ask that the Department reject the March 14, 2003, determination of the National Indian Gaming Commission (NIGC) that the parcel proposed to be taken into trust would qualify as ‘restored land[.]’ ... We are not inclined to revisit this decision now because the Office of the Solicitor reviewed this matter in 2003, and *194 concurred in the NIGC’s determination of March 14, 2003.” There is no indication that the Interior Department ever revisited this determination and actually considered the County’s evidence.
On February 8, 2007, the Gaming Commission approved the Tribe’s gaming ordinance, indicating that the approval was “only for gaming on Indian Lands.” On May 8, 2008, the Secretary published in the Federal Register his final decision to take the Tribe’s land into trust.[2] The County filed an action claiming that both agency actions were arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706. The district court granted summary judgment in favor of the agencies, ruling that the agencies had considered “the necessary factors,” and the County appealed.
II.
The case boils down to several straightforward propositions of administrative law. We have what is known as informal agency adjudication. Governing procedural rules, derived mainly from § 555 of the APA, 5 U.S.C. § 555, and the Due Process Clause, are few. Even so, agency decisions in informal adjudication are subject to judicial review under § 706 of the APA. See, e.g., Reliance Elec. Co. v. Consumer Prod. Safety Comm’n, 924 F.2d 274, 277 (D.C.Cir.1991). If the agency decision is arbitrary, capricious or an abuse of discretion it must be set aside.
Two legal propositions are important to the disposition of this case.
First, under § 555(e), the agency must provide an interested party—here Butte County—with a “brief statement of the grounds for denial” of the party’s request. As this court held in Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C.Cir.2001), the agency must explain why it decided to act as it did. The agency’s statement must be one of “reasoning”; it must not be just a “conclusion”; it must “articulate a satisfactory explanation” for its action. 259 F.3d at 737 (quoting Henry J. Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199, 222, and Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443(1983)).
Second, an agency’s refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706. See, e.g., State Farm, 463 U.S. at 43, 103 S.Ct. 2856; Comcast Corp. v. FCC, 579 F.3d 1, 8 (D.C.Cir.2009). This proposition may be deduced from case law applying the substantial evidence test, under which an agency cannot ignore evidence contradicting its position. “The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.” Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Although we are dealing with the question whether agency action is arbitrary or capricious, “in their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same.” Ass’n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d 677, 683 (D.C.Cir.1984); accord Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 243 (D.C.Cir.2008).
The Interior Department managed to violate the minimal procedural requirements § 555(e) imposed. When Butte County furnished the Interior Secretary’s *195 office with a copy of the Beckham Report and gave numerous reasons why the Tribe’s land did not constitute “restored land,” that issue was still pending before the Secretary. The Secretary’s final determination did not come until two years later, on March 14, 2008.[3] Yet the entirety of Interior’s response to Butte County was this: “We are not inclined to revisit this decision [the opinion of the Gaming Commission] now' because the Office of the Solicitor reviewed this matter in 2003, and concurred in the NIGC’s determination of March 14, 2008.”
This response violates § 555(e) for the same reason the response in Tourus Records violated that provision. The response “provides no basis upon which we could conclude that it was the product of reasoned decisionmaking.” 259 F.3d at 737. It had all the explanatory power of the reply of Bartelby the Scrivener to his employer: “I would prefer not to.”[4] Which is to say, it provided no explanation.
Interior’s response was also arbitrary. Reasoned decisionmaking is not a procedural requirement. Cross-Sound Ferry Servs., Inc. v. ICC, 738 F.2d 481, 487 (D.C.Cir.1984). It stems directly from § 706 of the APA. That much was made clear in another informal adjudication case—Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Interior’s response speaks as if the Secretary had already decided the issues—“We are not inclined to revisit” the matter—when in fact the matter remained pending. The rest of the response is senseless. So what if the Solicitor had reviewed the Gaming Commission’s decision in 2003 and agreed with it? The Secretary had yet to decide whether he agreed, which is what counted.[5] The very point of Butte County’s submission was that the information it submitted called into doubt the judgment of the Gaming Commission. To refuse to evaluate that information because the Solicitor— who never looked at it—agreed with the Gaming Commission is totally irrational,
All that remains is Interior’s argument that several statements in an environmental assessment[6] supplied the missing rea- *196 sonmg and showed that the Secretary in fact did take into account the County’s evidentiary submission. The environmental assessment came after Interior had advised the County that it would not revisit the restored lands question. There is nothing to indicate that it changed its mind; in fact the environmental assessment relied on the response to the County attorney. And it added that whether the Tribe’s newly-acquired lands qualified as restored lands was irrelevant to the question being addressed—namely, whether the Secretary’s taking the lands into trust to allow the Tribe to operate a casino there would have a significant environmental impact. The only other point in the environmental assessment was that Interior could not rescind the federally-recognized status of the Tribe. This comment and the others were responsive to an August 2006 letter from a Butte County administrator dealing with environmental issues. But the comment was not responsive to the arguments raised in the County attorney’s letter regarding restoration of the lands.
According to our dissenting colleague, the environmental assessment “indicated that Interior understood the County and the Beckham Report to be denying the Tribe’s existence at the Chico Ranchería on the thesis that the ‘modern’ Tribe had no connection with the ‘historical’ Me-choopda Tribe that occupied vast areas of Butte County and hence had no historical connection to [the historical tribe’s] land.” Dissenting Op. at 202-03. But the County attorney’s letter submitted with the Beck-ham Report clearly states that the County challenged Coleman’s restored lands opinion and “[did] not contest the Mechoopda’s federal recognition.” Rather, it argued that “the only land ever occupied by the people who ultimately were recognized as a tribe was the Bidwell Ranch property-[T]he tribal members cannot demonstrate any ties or connections to any other property.” The thesis of the Beck-ham Report, as the dissent appears to recognize at one point, goes entirely to the restored lands issue by supporting the County’s argument that the Tribe had no connection to any land other than its former ranchería. The later letter from the Butte County administrator did, in fact, challenge the Tribe’s status, which explains why the environmental assessment advised the County that recognition was irreversible. But that point does not speak at all to the Tribe’s historic connection with the land in question.
Our dissenting colleague provides her own analysis of the Beckham Report and concludes that it does not undermine the evidence the Tribe submitted. We are not so sure, but that is not the point. An “agency’s action must be upheld, if at all, on the basis articulated by the agency itself.” State Farm, 463 U.S. at 50, 103 S.Ct. 2856 (citing SEC v. Chenery, 332 U.S. 194, 196-97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). The Secretary mentioned none of the dissent’s reasons for rejecting the Beckham Report. The Secretary simply refused to give the County an audience.
For all of these reasons, we set aside the Secretary’s final action to take the Tribe’s lands into trust.[7] The case is remanded *197 for further proceedings consistent with this opinion.

So Ordered.

. If the tribe regained recognition through federal legislation and the legislation authoi-ized the Interior Secretary to take particular parcels of land into trust for the tribe, the Secretary will consider those lands "restored.” 25 C.F.R. § 292.11(a)(1). That situation, not present here, describes City of Roseville v. Norton, 348 F.3d 1020 (D.C.Cir.2003).

. The Secretary has stayed the land convey-anee pending the outcome of this litigation.

. According to agency guidelines, whether lands qualify as restored "is a decision made by the Secretary when he or she decides to take land into trust for gaming"; Indian lands opinions are prepared because the agencies are "in need, from time to time, for legal advice.” See Memorandum of Agreement Between the National Indian Gaming Commission and the Department of the Interior. Indian lands opinions are "advisory in nature and thus do not legally bind the persons vested with the authority to make final agency decisions.” See Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed.Reg. 29,354, 29,372 (May 20, 2008).

. The first of many such exchanges continued thus:
"Prefer not to,” echoed I, rising in high excitement, and crossing the room with a stride. “What do you mean? Are you moonstruck? I want you to help me compare this sheet here—take it," and I thrust it towards him.
"I would prefer not to,” said he.
Herman Melville, Bartleby, the Scrivener: A Story of Wall Street 10 (Dover 1990) (1853).

. It is not correct to say, as the dissent does, that by the time the County submitted its letter, the issue had been decided and that the County was asking the Secretary to "reopen” the matter. Dissenting Op. at 201. The fact is that the Secretary did not make a decision until two years after the County sent the letter. (The determination in this case was actually made by the Assistant Secretaiy—Indian Affairs, to whom the Secretary had delegated authority. See 209 Departmental Manual 8,1. The Solicitor may have made up his mind but the Secretary did not delegate decisionmaking authority to him. See note 3, supra.)

. Environmental assessments are done to determine whether the agency needs to prepare an environmental impact statement for major *196 federal action pursuant to the National Environmental Policy Act, 42 U.S.C. § 4232(C). See Humane Soc. of the United States, 840 F.2d 45, 61-62 (D.C.Cir.1988).

. The County also asks us to set aside the Gaming Commission’s approval of the Tribe’s gaming ordinance. The theory apparently is that in approving the ordinance, the Commission determined that the Tribe’s land qualified as restored land. But the Commission’s letter of approval, which came well before the Secretary’s final decision regarding the land, belies this theory. The letter simply stated that *197 the Commission approved the ordinance "only for gaming on Indian Lands,” without stating whether the land the Tribe had purchased would wind up in that category. In light of our decision vacating the Secretary’s land restoration determination, the Commission’s approval therefore has no effect and we see no reason to vacate it. The dissent apparently agrees.