# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 15, 2017       Decided April 13, 2018

No. 16-5240

BUTTE COUNTY, CALIFORNIA,
APPELLANT

v.

JONODEV OSCEOLA CHAUDHURI, CHAIRMAN, NATIONAL
INDIAN GAMING COMMISSION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00519)

*Dennis J. Whittlesey*, *Jr.* argued the cause and filed the briefs for appellant.

*Jeffrey S. Beelaert*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, and *William B. Lazarus* and *Robert P. Stockman*, Attorneys.

*Michael J. Anderson* argued the cause and filed the brief for tribal appellee Mechoopda Indian Tribe of Chico Rancheria, California.

Before: ROGERS, SRINIVASAN and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: The Indian Gaming Regulatory Act allows a federally-recognized Indian tribe to conduct gaming on lands held in trust by the Secretary of the Interior for the tribe's benefit. 25 U.S.C. §§ 2710(b)(1), 2703(4)(B). The authorization to conduct gaming generally applies only if the lands had been taken into trust as of the Act's effective date of October 17, 1988. *Id.* § 2719(a). But the Act permits gaming on lands that are taken into trust after that date "as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii). That exception for "restored lands" helps ensure "that tribes lacking reservations when [the Act] was enacted are not disadvantaged relative to more established ones." *City of Roseville v. Norton*, 348 F.3d 1020, 1030 (D.C. Cir. 2003).

In 1992, the Mechoopda Tribe regained its federal recognition. Twelve years later, the Tribe asked the Secretary to take into trust a 645-acre parcel in Chico, California, so that the Tribe could operate a casino on the property. The Tribe argued that it could conduct gaming on the property because the parcel qualified as "restored lands" within the meaning of the statutory exception. The Secretary agreed with the Tribe, but this court vacated the Secretary's decision and remanded the matter for further proceedings. *Butte Cty. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010).

In 2014, the Secretary reconsidered the issue and again held that the Chico parcel constitutes "restored lands." Butte County, where the parcel is located, sued in federal district court, arguing that the Secretary's decision was procedurally

defective and substantively unreasonable. The district court rejected the County's challenge and upheld the Secretary's decision. We affirm the district court's judgment.

I.

A.

This case concerns the Indian Gaming Regulatory Act's restored-lands exception. That exception, as noted, permits gaming on property taken into trust after the Act's effective date "as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). To meet that exception, a tribe that has regained its federal recognition must prove (among other things) that it has "a significant historical connection to the land" at issue. 25 C.F.R. § 292.12(b); *see Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney for W. Dist. of Mich.*, 198 F. Supp. 2d 920, 935 (W.D. Mich. 2002).

In 2002, the Mechoopda Tribe asked the Department of the Interior—specifically, the National Indian Gaming Commission—to provide an opinion as to whether the 645-acre Chico parcel would qualify as "restored lands." The Commission's Office of General Counsel said the parcel would qualify, so the Tribe applied for the land to be held in trust to enable the development and operation of a casino on the property. Before the Secretary could issue a notice of final decision, Butte County, seeking to dispute the treatment of the parcel as restored lands, submitted a report authored by a history professor, Dr. Stephen Beckham. Beckham's report concluded that, although the pre-1850 Mechoopda Tribe arguably had historical connections to the Chico parcel, the modern Tribe was not biologically descended from the pre-

1850 Tribe. Beckham opined that the modern Tribe thus lacked the requisite historical connection to the parcel.

The Secretary issued a final decision taking the land into trust, but without giving express consideration to the Beckham report. Butte County challenged the Secretary's decision in federal district court. The court ruled in favor of the agency. *Butte Cty. v. Hogen*, 609 F. Supp. 2d 20, 28-30 (D.D.C. 2009). On appeal, we held that, by failing to give reasons for rejecting the Beckham report, the Secretary had "violate[d] the minimal procedural requirements" applicable in an informal agency adjudication. *Butte Cty.*, 613 F.3d at 194.

On remand, the Secretary opted to reopen the administrative record. The Secretary gave the County 30 days to introduce new evidence and gave the Tribe 30 days to respond. In a letter the County alleges was sent only to the Secretary (not the County), the Tribe requested a 15-day extension, which the Secretary granted. The Tribe then submitted an expert report prepared by Dr. Shelly Tiley, an anthropologist. The report purported to rebut Beckham's conclusion that the modern Mechoopda Tribe was not descended from the pre-1850 Mechoopda Tribe. The Secretary then announced that the record was closed.

A week later, the County wrote to the Secretary, requesting permission to respond to Tiley's report. The Secretary agreed and granted the County 20 days. The County responded that the 20-day timeframe was inadequate, but the County made no request for an extension of time. The Secretary thereafter issued a decision taking the Chico parcel into trust under the restored-lands exception.

The County again challenged the Secretary's decision in district court. The County argued that the Secretary had

violated the Administrative Procedure Act in four ways: (i) by reopening the record on remand, (ii) by granting the Tribe a 15-day extension, (iii) by giving the County only 20 days to respond to Tiley's report, and (iv) by issuing a substantive decision that was arbitrary and capricious. In support of its substantive challenge, the County submitted a second report prepared by Beckham in 2014, this one a direct response to Tiley's report.

Both parties moved for summary judgment, and the district court granted the Secretary's motion. This appeal followed.

## II.

The County raises both procedural and substantive challenges to the Secretary's decision to treat the Chico parcel as restored lands on which the Tribe may operate a casino. We, like the district court, see no basis to set aside the Secretary's decision.

## A.

We first consider the County's procedural objections to the Secretary's determination. When the Secretary considers an application to take lands into trust under the restored-lands exception, the agency, we have explained, engages in "what is known as informal agency adjudication." *Butte Cty.*, 613 F.3d at 194. For that type of agency action, the "[g]overning procedural rules" are supplied by § 555(e) of the Administrative Procedure Act. *Id.* Under that provision, an agency, when denying an application, must give the applicant "[p]rompt notice . . . accompanied by a brief statement of the grounds for [the] denial." Agencies can voluntarily go beyond the procedural requirements of the Administrative Procedure

Act, but courts generally cannot compel agencies to do more than the statute demands (unless additional procedural safeguards are necessary to satisfy due process requirements). *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 653-56 (1990); *Dist. No. 1, Pac. Coast Dist. Marine Engineers' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42-43 (D.C. Cir. 2000).

Here, the County first contends that the Secretary erred by reopening the administrative record on remand.  The remand came about after we vacated the Secretary's initial decision to take the Chico parcel into trust because the Secretary had failed to consider Beckham's 2006 report.  *Butte Cty.*, 613 F.3d at 194-95.  We remanded "for further proceedings consistent with [our] opinion."  *Id.* at 196-97.  The district court then remanded the matter to the Secretary so that he could "reconsider his decision to acquire the Chico Parcel."  J.A. 484A.  (Because this matter has spanned the terms of two different Secretaries, we use different pronouns to refer to the Secretary depending on who was in office at the relevant time.)  The district court specifically instructed the Secretary to make the 2006 "Beckham Report . . . part of the administrative record on remand."  *Id.* (formatting modified).

Neither our decision, nor that of the district court, instructed the Secretary that he could not reopen the record. And in the absence of any specific command to that effect, the Secretary was generally free to determine in his discretion whether to accept additional evidence.  *See Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006).  The County relies on *Tennis Channel, Inc. v. FCC*, in which we upheld an agency's refusal to reopen the administrative record on remand.  827 F.3d 137, 144-45 (D.C. Cir. 2016).  But *Tennis Channel* fully supports recognizing an agency's broad discretion in deciding whether to accept new evidence.  There,

the agency decided against reopening the record; and here, the Secretary made the opposite choice, permitting both the County and the Tribe to submit new evidence. The County gives us no reason to conclude that the Secretary abused his discretion in that regard.

Next, the County contends that the Secretary should not have granted the Tribe a 15-day extension of time to submit its response (Tiley's report) to the County's submission. But the County does not contend that the Secretary somehow ran afoul of the Administrative Procedure Act by granting the extension. The County instead alleges that the Tribe misled the Secretary about the reasons for seeking the extension. The County's allegation is largely unsupported, but even assuming the *Tribe* misled the Secretary, that would not render the *Secretary's* grant of an extension improper. *See Suarez v. Sec'y of Health & Human Servs.*, 755 F.2d 1, 4 (1st Cir. 1985). Nor would it matter if, as the County contends, the Tribe sought the extension through an *ex parte* communication. Such communication is not necessarily impermissible in an informal agency adjudication like the proceeding at issue here. *See Dist. No. 1*, 215 F.3d at 42-43.

In its final procedural challenge, the County contends that the Secretary should have given it more than 20 days to respond to Tiley's report. But in an informal adjudication, there is no blanket obligation for an agency to allow the submission of rebuttal evidence at all. *See Jurewicz v. U.S. Dep't of Agriculture*, 741 F.3d 1326, 1334-35 (D.C. Cir. 2014). Here, moreover, the County had almost 60 days to respond to Tiley's report (from the time the County received the report to the end of the 20-day period), and the County at no point asked for an extension of time to submit its response or explained why 20 days would be inadequate. In those circumstances, the Secretary acted well within his authority in setting a 20-day

response deadline. This procedural challenge by the County thus fares no better than the others.

B.

We next consider the County's contention that the Secretary's substantive decision was arbitrary and capricious. That is so, the County submits, because the Secretary ignored or misconstrued facts that conflicted with her decision, many of which were presented in Beckham's 2006 and 2014 reports.

1.

As an initial matter, the Secretary was not required to account for facts first presented in Beckham's 2014 report. When reviewing agency action, we generally consider only "information [that] the agency [had] when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citation omitted). Thus, even if a party seeks to rely on evidence conflicting directly with an agency decision, we will not invalidate the decision as arbitrary and capricious based on the evidence if it "was not in the record at the time" of the decision. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. EPA*, 768 F.2d 385, 401 (D.C. Cir. 1985).

Here, the Secretary granted the Tribe's request to take the parcel into trust in January 2014. Beckham finished drafting his 2014 report almost six months later, in July. The 2014 report therefore was not—and could not have been—part of the record before the Secretary. It follows that, even if the Secretary's decision conflicted with the report, that conflict generally could not render her decision arbitrary and capricious.

Granted, there are exceptions to the ordinary rule that we do not consider evidence outside the record. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). But those "narrow and rarely invoked" exceptions apply when evidence is excluded from the record because of some "gross procedural deficienc[y]." *CTS Corp.*, 759 F.3d at 64 (quoting *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013)) (emphasis omitted). The County contends that Beckham's 2014 report was not part of the record because the Secretary gave the County inadequate time to prepare it. As we have explained, however, the Secretary committed no procedural error—much less a "gross" one—when he gave the County 20 days to respond to Tiley's report. We thus decline to consider Beckham's 2014 report when reviewing the Secretary's decision.

The County argues that, at a minimum, we should consider the 1910 decennial census referenced in Beckham's 2014 report. That is so, the County says, because the Secretary, as head of a federal agency, should have known about that evidence. But documents do not become part of an administrative record whenever an agency arguably should have been aware of them. Indeed, documents do not necessarily become part of an administrative record even if the agency *possessed* them at the time of the decision. *See, e.g., Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1182-83 (D.C. Cir. 1980). Instead, documents can become part of an administrative record if a party brings them to the attention of the agency *before* the decision is made. *See Theodore Roosevelt Conversation P'Ship v. Salazar*, 616 F.3d 497, 515 (D.C. Cir. 2010). In this case, there is no indication that the 1910 census records had been brought to the Secretary's attention before she granted the trust application, so we do not consider that evidence when evaluating her decision.

2.

The County contends that the Secretary ignored or misconstrued certain facts in the record in determining that the Chico parcel fits within the Indian Gaming Regulatory Act's restored-lands exception. That exception, as explained, permits the Tribe to conduct gaming operations on the parcel even though it was taken into trust after the Act's effective date. The exception applies to property "taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). Here, it is undisputed that the Tribe regained federal recognition in 1992. The only question thus is whether the Chico parcel constitutes "restored lands."

Before 2008, the Secretary assessed whether lands qualify as "restored lands" by considering three factors first set out in *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney for the Western District of Michigan*—namely, (i) "the factual circumstances of the acquisition," (ii) "the location of the acquisition," and (iii) "the temporal relationship of the acquisition to the tribal restoration." 198 F. Supp. 2d 920, 935 (W.D. Mich. 2002). Under the location factor, the Secretary examined whether the tribe had both historical and modern connections to the specific parcel at issue. *See, e.g.*, *Wyandotte Nation v. Nat'l Indian Gaming Comm'n*, 437 F. Supp. 2d 1193, 1214-17 (D. Kan. 2006).

In 2008, the Secretary promulgated a regulation codifying an updated test for determining whether lands qualified as "restored lands." Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, 29,377-78 (May 20, 2008) (codified at 25 C.F.R. § 292.12). That test likewise calls for considering three factors: (i) "modern connections to the land," (ii) "historical connection[s] to the land," and (iii) "a

temporal connection between the date of the acquisition of the land and the date of the tribe's restoration." *Id.*

Here, the Secretary initially decided to take the Chico parcel into trust in March 2008, shortly before the regulation took effect. After we vacated the Secretary's decision, the Secretary reassessed whether the parcel qualifies as "restored lands," this time applying both the *Grand Traverse Band* test and the test established by the regulation. The Secretary concluded that, under either test, the parcel constitutes "restored lands."

On appeal, the County argues only that the Tribe lacks a sufficient historical connection to the Chico parcel. Because that consideration is common to both tests, we have no occasion to consider whether one or the other test should control in the circumstances of this case. We instead assess only whether the Secretary's application of the historical-connection factor was arbitrary and capricious.

The Secretary concluded that, for two reasons, the Tribe had a sufficient historical connection to the Chico parcel. First, the Secretary explained that the parcel sits only "10 miles from the Tribe's former Rancheria." J.A. 406. In light of that "close proximity," the Secretary considered it appropriate to treat the Tribe's historical connections to the Rancheria as connections to the parcel itself. *Id.* That treatment is "reasonable," the Secretary determined, because the order restoring the Tribe's federal recognition "effectively preclude[d] the Tribe from acquiring any trust lands for the purpose of gaming within the boundaries of the former Rancheria" itself. *Id.*

Second, the Secretary determined that the Tribe also had direct historical connections to the Chico parcel, not just the nearby Rancheria. Before the Tribe moved to the Rancheria,

its members had been scattered across several villages located on, or "very close to," the parcel. J.A. 408-09. And even if Tribe members did not actually live on the parcel, they almost certainly traversed it to reach other tribes with whom they traded and participated in joint religious ceremonies. *Id.* Indeed, the parcel is situated just one mile from the Pentz Hills, a set of buttes that are of spiritual significance to the Tribe. *Id.* at 409. The Tribe also hunted, fished, and gathered on the parcel. *Id.* at 408. And in 1851, the Mechoopda negotiated a treaty with the federal government, which, if ratified, would have included the Chico parcel within the Tribe's reservation. *Id.* at 409. For those reasons, the Secretary concluded that the Tribe's historical connections to the Chico parcel supported taking the land into trust for gaming purposes.

The County does not dispute that the Tribe has meaningful historical connections to the Rancheria, located 10 miles from the Chico parcel. Insofar as that is an "adequate and independent" rationale for the Secretary's decision, the County's failure to challenge that rationale would be reason enough to affirm here. *Steel Mfrs. Ass'n v. EPA*, 27 F.3d 642, 649 (D.C. Cir. 1994) (citing 5 U.S.C. § 706).

We need not resolve the adequacy of that rationale, though, because the County's challenge to the Secretary's second rationale also fails. The thrust of the County's challenge is that members of the modern Mechoopda Tribe are not biological descendants of members of the pre-1850 Mechoopda Tribe. Instead, the County argues, Indians from many tribes lived together at the Rancheria in the late 1800s and early 1900s, in a "multi-ethnic, polyglot group." Appellant's Opening Br. 12. According to the County, the descendants of that group—not the pre-1850 Tribe—are what we now know as the Mechoopda Tribe.

In the County's view, the Secretary ignored several facts supporting that theory. The County first points to a 1914 report prepared by W.C. Randolph, an officer of the Bureau of Indian Affairs. Randolph visited the Rancheria and concluded that the Indians living there did not "belong to any particular band" but instead were "remnants of various small bands, originally living in Butte and nearby counties." J.A. 188. The County also relies on a census conducted by the Bureau from 1928 to 1933. According to records from that census, less than a quarter of the people living on the Rancheria identified as Mechoopda, and the residents included members of at least seven other tribes. J.A. 190-95.

Contrary to the County's submission, the Secretary did not ignore either the Randolph report or the 1928-33 census records. True, in the section of the Secretary's decision addressing the Tribe's historical connection to the parcel, the Secretary did not explicitly mention either source. But the Secretary did cite Beckham's 2006 report for the proposition that, by the 1850s, the Rancheria's population was "an amalgamation of Indians from numerous tribes." J.A. 406-07. And that conclusion was based (in large part) on the Randolph report and the census.

The Secretary then explained why that information did not change her analysis. Although many Indians at the Rancheria descended from non-Mechoopda tribes, those Indians, over time, "integrated themselves into the Mechoopda culture." J.A. 401. The Secretary observed that the Rancheria had a *kúm,* a ceremonial hut forming the central feature of Mechoopda villages. *Id.* at 399 & n.79. The Rancheria also had a dance society, the most important social organization in Mechoopda communities. *Id.* And the primary language spoken on the Rancheria was Maidu, the Mechoopda Tribe's native tongue.

The Secretary concluded for those reasons that the Mechoopda Tribe, despite the influx of new members, lived on.

That explanation also helps show that the Secretary did not misconstrue the facts in the way alleged by the County. In her final decision, the Secretary cited a 1906 census of the Indians residing on the Rancheria, this one taken by another Bureau officer, C.E. Kelsey. The Secretary noted that Kelsey's records identified two leaders of the Rancheria community—Holi Lafonso and William Conway—"as the head[s] of the list of Mechoopda families." J.A. 420. The County emphasizes that the census records in fact do not list the tribal affiliation of either man; and although Lafonso had descended from the Mechoopdas, Conway seems to have descended from members of the Ukie tribe. J.A. 191-92. But when properly considered in light of the Secretary's understanding of the evolution of the Tribe's makeup on the Rancheria, the Secretary's observation about Lafonso and Conway presents no basis for setting aside her determination: whatever tribe Lafonso and Conway may originally have been born into, they (like everyone on the Rancheria) integrated themselves into the Mechoopda Tribe. They therefore could fairly be considered the "head[s] . . . of Mechoopda families."

The County finally contends that, even if the Indians on the Rancheria adopted the Tribe's cultural traditions, they did not adopt the Tribe's political traditions. The Secretary permissibly concluded otherwise. Mechoopda villages were always led by a "headman." J.A. 399. In accordance with that structure, the Rancheria community recognized a headman, who was always a person biologically descended from the pre-1850 Mechoopda Tribe. *Id.* & n.79. The Indians on the Rancheria thus integrated themselves not only into the Tribe's cultural traditions, but also into its "political structure." J.A.

408. For all of those reasons, the Secretary's substantive decision survives arbitrary-and-capricious review.

\* \* \* \* \*

For the reasons set forth in this opinion, we affirm the judgment of the district court.

*It is so ordered.*