STEPHANIE M. ROSE, JUDGE UNITED STATES DISTRICT COURT
This lawsuit represents the latest chapter in a long-running dispute over whether the Ponca Tribe of Nebraska (the "Tribe") may conduct Class II gaming on a 4.8-acre tract of land in Carter Lake, Iowa (the "Carter Lake Parcel"). Plaintiffs-the City of Council Bluffs, Iowa, joined by Intervenor-Plaintiffs the State of Nebraska and the State of Iowa-challenge a November 13, 2017 decision by the National Indian Gaming Commission ("NIGC" or the "Commission") to approve the Tribe's site-specific gaming ordinance involving that land. Plaintiffs assert claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. , against Defendants the United States Department of the Interior ("DOI") and the NIGC, along with three federal employees in their official capacities-Ryan K. Zinke as Secretary of the DOI (the "Secretary"), Jonodev Osceola Chaudhuri, as Chairman of the NIGC, and Kathryn Isom-Clause as Vice Chair of the NIGC. Before the Court are the parties' cross-motions for summary judgment. [ECF Nos. 22; 35]. Neither party requested oral argument, and the Court finds the issues can be resolved without it. See LR 7(c). This matter is fully submitted and ready for decision. For the reasons stated below, Plaintiffs' motion is GRANTED in part and DENIED in part; Defendants' motion is DENIED.
*1281 I. BACKGROUND[1]
A. Indian Gaming Regulation Act
In 1988, Congress enacted the Indian Gaming Regulation Act ("IGRA") to "provide clear standards or regulations for the conduct of gaming on Indian lands," 25 U.S.C. § 2701(3), and to ensure such gaming remained "a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." Id. § 2702(1). The IGRA applies only to federally recognized tribes, which may conduct gaming only on "Indian lands" within their jurisdiction. Id. §§ 2703(5), 2710(b)(1), 2710(d)(3)(A). The term "Indian lands" includes land which the United States holds in trust for the benefit of any Native American tribe and over which a Native American tribe exercises governmental authority. Id. § 2703(4). The IGRA divides gaming on "Indian lands" into three classes. The Tribe seeks to conduct Class II gaming, which includes bingo and "non-banking" card games[2] permitted by state law. Id. § 2703(7). To conduct Class II gaming on "Indian lands," a tribe must, among other requirements, enact a tribal gaming ordinance and obtain approval from the NIGC. Id. § 2710; 25 C.F.R. § 522.
The IGRA generally prohibits gaming activities on land acquired into trust by the United States on behalf of a tribe after October 17, 1988. 25 U.S.C. § 2719(a). There are several exceptions to this general prohibition, two of which are relevant here. One exception permits gaming under a two-part determination whereby "the Secretary ... determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community" and "the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination." Id. § 2719(b)(1) A). The second relevant exception permits gaming activity on land that is acquired in trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." Id. § 2719(b)(1)(B)(iii) (the "Restored Lands Exception").
B. The Ponca Tribe of Nebraska
The United States terminated its government-to-government relationship[3] with *1282 the Tribe on September 5, 1962.[4] See Pub. L. No. 87-629, 76 Stat. 429; 25 U.S.C. §§ 971 - 980. In 1990, Congress restored its relationship with the Tribe through the Ponca Restoration Act, Pub. L. No. 101-484, 104 Stat 1167 (codified as amended at 25 U.S.C. §§ 983 - 983h ) ("PRA" or the "Act").
Section three of the Act restores federal recognition and provides that "[a]ll Federal laws of general application to Indians and Indian tribes (including the Act of June 18, 1934 (48 Stat. 984; 25 U.S.C. § 461 et seq. ), popularly known as the Indian Reorganization Act ["IRA"] ) shall apply with respect to the Tribe and to the members." 25 U.S.C. § 983a. Subsection 4(a) of the Act restores all the Tribe's rights and privileges which were abrogated or diminished by the Tribe's termination. Id. § 983b(a). Subsection 4(c) provides that the Secretary "shall accept not more than 1,500 acres of any real property located in Knox or Boyd Counties, Nebraska, that is transferred to the Secretary for the benefit of the Tribe." Id. § 983b(c). The Secretary shall accept such property "in the name of the United States in trust for the benefit of the Tribe." Id. The Act allows the Secretary to "accept any additional acreage in Knox or Boyd Counties pursuant to his authority" under the IRA. Id.
Although the PRA allows the Secretary to acquire land in trust for the Tribe, subsection 4(e) provides that "[r]eservation status shall not be granted any land acquired by or for the Tribe." Id. § 983b(e). Because the PRA prohibits reservation status, the Act, as amended, designates a service area for the Tribe and its members, which includes "members of the Tribe residing in Sarpy, Burt, Platte, Stanton, Holt, Hall, Wayne, Knox, Boyd, Madison, Douglas, or Lancaster Counties of Nebraska, Woodbury or Pottawattomie [sic] Counties of Iowa, or Charles Mix County of South Dakota." Id. § 983c. The Carter Lake Parcel is located in Pottawattamie County, Iowa, within the designated service area.
C. Trust Acquisition of the Carter Lake Parcel
On September 24, 1999, the Tribe purchased the Carter Lake Parcel. [ECF No. 19-2 at 264]. On January 10, 2000, the Tribe passed a resolution requesting that the Bureau of Indian Affairs ("BIA") place the land into trust to allow the Tribe "to provide services to [its] members, primarily health services." [ECF No. 19-3 at 420]. The BIA considered the request under the DOI's discretionary authority to acquire land in trust for tribes under the IRA and its implementing regulations. Id. at 389, 392, 394, 415. On September 15, 2000, the Regional Director of the BIA granted the Tribe's request. Id. at 226-30. The State of Iowa and Pottawattamie County, Iowa, timely appealed the Regional Director's decision to the Interior Board of Indian Appeals ("IBIA"). Id. at 190, 222. On August 7, 2002, the IBIA affirmed the Regional Director's decision (the "IBIA Trust Decision"). See Iowa & Bd. of Supervisors of Pottawattamie Cty. v. Great Plains Reg'l Dir., BIA , 38 IBIA 42, 55 (Aug. 7, 2002).
At that point, the State of Iowa could have sought judicial review of the IBIA
*1283 Trust Decision. Although the relevant statute of limitations was six years, see 28 U.S.C. § 2401(a), it was the Government's position at the time that the Quiet Title Act precluded judicial review of a decision to take Native American lands into trust once the United States acquired title. See Land Acquisitions, 61 Fed. Reg. 18082-01, at 18082 (Apr. 24, 1996). To ensure that interested parties had an opportunity to appeal such decisions, DOI regulations required the DOI to announce any final administrative determination to take land into trust, and wait thirty days from the date of the announcement before acquiring title to the land. See id. The Government's interpretation of the Quiet Title Act was ultimately incorrect, as the Supreme Court of the United States ruled in 2012 that the Quiet Title Act did not bar judicial review under the APA of the Secretary's decision to take land into trust for a Native American tribe. See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak , 567 U.S. 209, 228, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012).
In any event, to avoid further litigation, the State of Iowa purportedly reached a verbal agreement with the Tribe that the Carter Lake Parcel could only be used for gaming if the Tribe obtained the "two-part determination" under 25 U.S.C. § 2719(b)(1)(A) (the "2002 Agreement"). [ECF No. 18-3 at 4]. The State of Iowa negotiated the agreement with the Tribe's attorney, Michael Mason. See [ECF No. 18-5 at 47-48]. According to Plaintiffs, Mason represented that he had "the authority to bind the Tribe to the terms of the proposed settlement." Id. at 49. However, the parties dispute whether he in fact had that authority.
On November 26, 2002, Mason sent an email to the BIA requesting that it include the following language in its published notice of intent to take the Carter Lake Parcel into trust:
The trust acquisition of the Carter Lake lands has been made for non-gaming related purposes, as requested by the Ponca Tribe and discussed in the September 15, 2000 decision under the Regional Director's analysis of 25 C.F.R. 151.10(c). As an acquisition occurring after October 17, 1988, any gaming or gaming-related activities on the Carter Lake lands are subject to the Two-Part Determination under 25 U.S.C. Sec. 2719. In making its request to have the Carter Lake lands taken into trust, the Ponca Tribe has acknowledged that the lands are not eligible for the exceptions under 25 U.S.C. Sec 2719(b)(1)(B). There may be no gaming or gaming-related activities on the lands unless and until approval under the October 2001 Checklist for Gaming Acquisitions, Gaming-Related Acquisitions and Two-Part Determinations Under Section 20 of the [IGRA] has been obtained.
Id. at 222. In the email, Mason stated that the language "was negotiated with Ass't Attorney General Jean Davis of the State of Iowa and County Attorney Richard Crowl of Pottawattamie County, Iowa." Id.
On December 3, 2002, the BIA published a Notice of Intent to Take Land in Trust in the Council Bluffs Daily Nonpareil newspaper. See [ECF No. 19-3 at 444-45]. The notice did not include the language, excerpted above, requested by Mason. On December 6, 2002, a Corrected Notice of Intent to Take Land in Trust (the "Corrected Notice") was published in the same newspaper. [ECF No. 18-3 at 219-20, 223-24]. The Corrected Notice added the requested language. There is no formal written agreement between the Tribe and the State of Iowa regarding the Carter Lake Parcel's gaming eligibility, and the trust deed does not contain a restriction against *1284 gaming on the land. See [ECF No. 19-4 at 143]. On January 28, 2003, the Tribe executed a deed conveying the Carter Lake Parcel to the United States, and the BIA completed the trust acquisition in February 2003. [ECF No. 19-2 at 266-69].
The Tribe built and began operating a health care facility on the parcel in 2000. [ECF No. 18-3 at 174]. For budget reasons, however, the Tribe eventually abandoned that enterprise. Id.
D. The 2007 NIGC Decision
In October 2005, the Tribe, through its then-attorneys Faegre & Benson LLP,[5] requested that the NIGC issue an advisory opinion determining that the Carter Lake Parcel constitutes restored lands for a restored tribe. [ECF No. 19-4 at 266]. In February 2006, before the NIGC could respond to the request, the Tribe submitted a site-specific gaming ordinance for review, which sought NIGC approval for an ordinance identifying the Carter Lake Parcel as "Indian lands" eligible for gaming under the IGRA. See id. at 109-110. The NIGC solicited comments from the State of Iowa, which submitted a written response opposing the Tribe's claim that the Carter Lake Parcel qualified as restored lands. See [ECF No. 19-3 at 487]. In its response, the State of Iowa specifically discussed the 2002 Agreement and suggested the Tribe was estopped from repudiating the agreement. See id. at 489. The Tribe withdrew its request for a gaming ordinance in May 2006. Id. at 484. A month later, the Tribe's attorney responded to the State of Iowa's estoppel argument in a letter to the NIGC, asserting that "any statements made by Michael Mason after the IBIA decision was handed down were not authorized by the Tribe." Id. at 475. In August 2006, the Ponca Tribal Council (the "Tribal Council") passed a resolution wherein it declared that the "Tribal Council was not aware of and did not approve the language that was added to the [Corrected Notice]." Id. at 446.
On July 23, 2007, the Tribe submitted to the NIGC a new request for approval of a site-specific ordinance to use the Carter Lake Parcel for gaming, stating that the land was eligible for gaming under the IGRA's Restored Lands Exception. See [ECF No. 19-2 at 216]. The State of Iowa opposed the request. On October 22, 2007, the Chairman of the NIGC issued a decision disapproving the ordinance on the grounds that, although the Tribe was a restored tribe, the Carter Lake Parcel was not restored lands eligible for gaming (the "Chairman's Decision"). [ECF No. 18-3 at 163]. The Chairman found that "the factual circumstances surrounding the acquisition of the Carter Lake land show that it was not taken into trust as part of the Tribe's restoration." Id.
The Chairman incorporated by reference a memorandum prepared by then-Associate General Counsel to the NIGC, Michael Gross (the "Gross Memorandum"). Id. at 163, 165. Gross, like the Chairman, found that the Carter Lake Parcel was not taken into trust as part of the Tribe's restoration. Id. at 165. In making that determination, Gross considered various aspects of the 2002 Agreement when analyzing the factual circumstances surrounding the trust acquisition. He noted that the Tribe "did not contemplate a gaming use for the land when it applied to have the land taken into trust." Id. at 191. He also cited the Tribe's representations before the IBIA that the land would not be used *1285 for gaming. See id. at 191-92. He then discussed the purported oral agreement between the State of Iowa and the Tribe, as evidenced by the Corrected Notice, that the Tribe would not use the land for gaming. See id. at 192-94. Gross concluded that "[e]very government involved in the acquisition regarded the [Carter Lake Parcel] as land that was not restored within the meaning of 25 U.S.C. § 2719(b)(1)(B)(iii), a characterization that the Tribe has not, until now, disputed." Id. at 194.
The Tribe appealed the Chairman's Decision to the full Commission. See [ECF No. 19-2 at 146]. On December 31, 2007, the Commission reversed the Chairman's Decision and approved the Tribe's site-specific ordinance (the "2007 Final Order"). See [ECF No. 18-3 at 130-47]. In relevant part, the NIGC found: (a) the Chairman's disapproval improperly relied on the Tribe's intended use of the land; (b) the Chairman's disapproval improperly relied on events that occurred after the DOI's final agency decision was made to take the Carter Lake Parcel into trust; and (c) excluding those factors, the factual circumstances of the acquisition weighed in favor of restoration. See id. at 131.
E. Nebraska ex rel. Bruning v. United States Department of Interior
In January 2008, the State of Nebraska, the State of Iowa, and the City of Council Bluffs, Iowa-the same Plaintiffs presently before the Court-challenged the 2007 Final Order before a different judge in this district. Nebraska ex rel. Bruning v. U.S. Dep't of Interior , No. 1:08-CV-0006-CRW-CFB (S.D. Iowa) ("Nebraska I "). Plaintiffs argued that the NIGC lacked authority to make a restored lands determination, that the 2007 Final Order was arbitrary and capricious, and that the 2007 Final Order was contrary to the PRA. The district court ruled in favor of Plaintiffs, determining that the NIGC lacked the authority to declare the Carter Lake Parcel "restored lands" based on the 2002 Agreement. See id. , slip op. at 9 (Nov. 28, 2008), ECF No. 56. In the alternative, the court held that, even if the NIGC had the authority to make the gaming decision, the decision lacked a rational basis on the law and facts of the record and was therefore arbitrary and unlawful. See id. at 10. The court specifically faulted the NIGC for failing to consider events after the DOI's decision to take the Carter Lake Parcel into trust-i.e., the 2002 Agreement-when analyzing the factual circumstances of the trust acquisition. Id. Thus, the court reversed and vacated the 2007 Final Order.
The United States Court of Appeals for the Eighth Circuit reversed the district court and ordered the matter remanded back to the NIGC and DOI for the following: (1) NIGC to consider the validity and legal effect of the 2002 Agreement; and (2) DOI to address whether the PRA limits the Tribe's restored lands for the purposes of the IGRA to Knox and Boyd Counties, Nebraska. See Nebraska ex rel. Bruning v. U.S. Dep't of Interior , 625 F.3d 501, 512-13 (8th Cir. 2010) (" Nebraska II "). Judge Kornmann of the United States District Court for the District of South Dakota, sitting by designation, filed a dissenting opinion arguing that remand was unnecessary because the plain language of the PRA restricted "restored lands" to those held in trust for the Tribe in Knox and Boyd Counties, Nebraska. See id. at 514 (Kornmann, J., dissenting). Judge Kornmann believed the NIGC's failure "to consider and apply the express clear language of the [Act]" and deny the Tribe's site-specific ordinance was arbitrary and capricious. Id.
F. Remand
1. 2008 DOI regulations
While Plaintiffs were challenging the 2007 Final Order, DOI regulations went *1286 into effect governing gaming on lands acquired in trust for Native American tribes after October 17, 1988 (the "Part 292 Regulations").See 25 C.F.R. §§ 292.1 - 292.26. The regulations set out a test for determining whether trust lands qualify for the Restored Lands Exception. Prior to the Part 292 Regulations, the DOI and NIGC made such determinations by applying the common law factors articulated in Grand Traverse Band of Ottawa & Chippewa Indians v. United States Attorney for the Western District of Michigan , namely: (1) the factual circumstances of the trust acquisition; (2) the location of the acquisition; and (3) the temporal relationship of the acquisition to the tribe's restoration. 198 F.Supp.2d 920, 935 (W.D. Mich. 2002) (" Grand Traverse II ").
Two provisions of the Part 292 Regulations are relevant to the instant dispute. First, 25 C.F.R. § 292.11 sets out the test for determining if trust lands are "restored lands" under the IGRA. It states, in relevant part:
(a) If the tribe was restored by a Congressional enactment of legislation recognizing, acknowledging, affirming, reaffirming, or restoring the government-to-government relationship between the United States and the tribe, the tribe must show that either:
(1) The legislation requires or authorizes the Secretary to take land into trust for the benefit of the tribe within a specific geographic area and the lands are within the specific geographic area; or
(2) If the legislation does not provide a specific geographic area for the restoration of lands, the tribe must meet the requirements of § 292.12.[6 ]
25 C.F.R. § 292.11(a). The second relevant provision is a grandfather provision. It states:
These regulations apply to all requests pursuant to 25 U.S.C. 2719, except:
(a) These regulations do not alter final agency decisions made pursuant to 25 U.S.C. 2719 before the date of enactment of these regulations.
(b) These regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw or modify such opinions.
Id. § 292.26. As discussed below, the NIGC did not apply the Part 292 Regulations to the proceedings on remand. The parties dispute whether that was appropriate.
2. The NIGC's 2017 decision
On remand, the DOI invited Plaintiffs and the Tribe to submit legal memoranda and supporting materials on whether the PRA limits the Tribe's restored lands to Knox and Boyd Counties. [ECF No. 18-4 at 144]. The parties submitted responses, and on March 13, 2012, the DOI submitted to the NIGC a sixteen-page letter (the "PRA Opinion") concluding that the PRA "does not limit the designation of restored lands for gaming purposes to lands located within Knox and Boyd Counties." [ECF No. 18-3 at 55]. The PRA Opinion set out a *1287 brief history of the Tribe, and analyzed the text of the Act. It considered the Act's legislative history, its purpose, and how courts have interpreted similarly structured statutes. The opinion contrasted the PRA with provisions from various other statutes in which Congress expressly limited the Secretary's ability to acquire land in trust for Native American tribes or the ability of the tribes to conduct gaming on trust lands. The opinion did not address whether the Carter Lake Parcel qualified as restored lands, nor did it discuss the apparent approach to statutory construction set out in 25 C.F.R. § 292.11(a), excerpted above.
The NIGC issued a briefing order on May 21, 2012, inviting the parties to submit legal memoranda on: (1) the authority of Mason to enter into the 2002 Agreement on behalf of the Tribe; (2) the legal effect and weight of the 2002 Agreement, as memorialized in the Corrected Notice; and (3) the legal effect of the Corrected Notice. Id. at 127. After consultation with the DOI, the NIGC issued an amended decision on November 13, 2017, upholding the 2007 Final Order to approve the Tribe's site-specific ordinance (the "Amended Final Order").
In the Amended Final Order, the NIGC concluded that the 2002 Agreement was not valid and therefore did not estop the Tribe from seeking approval of the site-specific ordinance based on the Restored Lands Exception. Applying the law applicable to sovereign governments, the Commission began by determining that Mason lacked actual authority-express or implied-to bind the Tribe to the agreement. See id. at 16. It noted that the Tribe's constitution "clearly authorizes the Tribal Council 'to negotiate and contract with the Federal, State, and local governments on behalf of the Tribe,' " and there was no evidence that the Tribal Council expressly authorized Mason to enter into the agreement. See id. at 18-19. The NIGC further determined that Mason lacked implied actual authority to enter into the agreement because "entering into an agreement with another government cannot be an integral part of his duties." Id. at 20. The Commission also found that the State of Iowa failed to satisfy its obligation to ensure that Mason-no matter his purported claims of authority-had the requisite authority to enter into the agreement. See id. at 23.
But the Commission did not stop there. It proceeded to determine that the Tribe both ratified and, later, repudiated the 2002 Agreement. On ratification, the NIGC considered whether the Tribal Council had sufficient knowledge of the material facts surrounding the agreement and acted in a way that signaled their acceptance of it. See id. at 23-24. The NIGC found that numerous circumstances between 2002 and 2005, taken together, satisfied this requirement. See id. at 25-26.
As to repudiation, the NIGC undertook a two-part analysis. First, it found the Tribe clearly expressed its intent to repudiate the agreement. The Commission highlighted statements to that effect in an October 2005 letter to the NIGC, subsequent letters to the NIGC in June and July 2006, and resolutions by the Tribal Council in August 2006 and April 2007 stating that the Tribe was neither aware of, nor approved, the language added to the Corrected Notice. Id. at 26- 27. Second, applying Pueblo of Santo Domingo v. United States , 647 F.2d 1087 (Ct. Cl. 1981), the NIGC found that the repudiation was timely. It reasoned that the State of Iowa had not expended resources in reliance on the 2002 Agreement; no tribunal had been burdened by it; and the State of Iowa was not otherwise prejudiced because it could have still filed a timely legal challenge to *1288 the IBIA Trust Decision. See id. at 27-28. Based on these factors, the NIGC found the Tribe was not estopped from asserting that the Carter Lake Parcel qualified for the Restored Lands Exception. Id. at 29.
The NIGC also concluded that the Carter Lake Parcel was restored lands for the Tribe. The Commission incorporated by reference the PRA Opinion, thus finding that the Act does not limit restored lands to trust lands in Knox and Boyd Counties. See id. at 30. It then considered whether to apply the Part 292 Regulations when conducting its restored lands analysis. The Commission found the Part 292 Regulations were inapplicable because of the regulations' grandfather provision. See id. at 32. The Commission observed that the regulations "do not alter" final agency decisions made before the Part 292 Regulations came into effect in June 2008, and the 2007 Final Order was issued on December 31, 2007. See id. The Commission added that, although the district court vacated that decision on judicial review, the Eighth Circuit reversed the district court and remanded the case back to the NIGC for further proceedings. Id. This, the NIGC reasoned, preserved the "final" status of the 2007 Final Order. Id. As to the grandfather provision's clause pertaining to matters involving written opinions issued before the Part 292 Regulations went into effect, the NIGC found it was applicable because the Gross Memorandum was issued alongside the Chairman's Decision denying the Tribe's application for a site-specific gaming ordinance. Id. at 33. The Commission determined that the Gross Memorandum "continues in effect, subject to 'full discretion to qualify, withdraw or modify such opinion[ ].' " Id. (alteration in original) (quoting 25 C.F.R. § 292.26(b) ).
Finally, the Commission evaluated the Grand Traverse II factors-the temporal, geographic, and factual circumstances surrounding the trust acquisition-and determined that the Carter Lake Parcel was restored lands. It is enough to note that the NIGC did not consider any of the factual circumstances surrounding the 2002 Agreement as part of its restored lands analysis. Instead, it focused on other factual circumstances, such as the absence of intervening trust acquisitions, the relationship between the Carter Lake Parcel and the Ponca Economic Development Plan, and the relationship between the parcel and the PRA's service area. See id. at 35-38.
G. The Present Dispute
Plaintiff City of Council Bluffs, Iowa, commenced this action on December 13, 2017, seeking judicial review under the APA of the Amended Final Order. [ECF No. 1]. The State of Iowa and State of Nebraska intervened in June 2018. [ECF Nos. 13; 14]. Plaintiffs seek: (1) a declaratory judgment that the Carter Lake Parcel does not qualify as restored lands under 25 U.S.C. § 2719(b)(1)(B)(iii) ; (2) a declaratory judgment vacating and setting aside as unlawful the Amended Final Order because the findings and conclusions therein are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (3) an order remanding the case with instructions that the NIGC deny the Tribe's request for a gaming ordinance specific to the Carter Lake Parcel; (4) an order awarding Plaintiffs their costs and reasonable attorney fees to the extent permitted by law; and (5) an order awarding Plaintiffs any other relief the Court deems just and equitable. See, e.g. , [ECF No. 1 at 14-15].
The parties have filed motions for summary judgment, arguing that they are entitled to judgment as a matter of law. Plaintiffs seek the relief stated above. Defendants ask the Court to deny Plaintiffs'
*1289 motion and enter a judgment affirming the Amended Final Order.
II. STANDARD OF REVIEW
A. Summary Judgment Standard
Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; Paulino v. Chartis Claims, Inc. , 774 F.3d 1161, 1163 (8th Cir. 2014). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis , 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson , 477 U.S. at 255, 106 S.Ct. 2505. Even so, at the summary judgment stage, courts must view "the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record." Pedersen v. Bio-Med. Applications of Minn. , 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting Johnson v. Wells Fargo Bank, N.A. , 744 F.3d 539, 541 (8th Cir. 2014) ).
B. Standard of Review under the APA
The APA governs the Court's review of agency actions. Section 706(2)(A) of the APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under this standard is "narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. , 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "To withstand judicial review under this standard, an agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' " Grace Healthcare of Benton v. U.S. Dep't of Health and Human Servs. , 603 F.3d 412, 422 (8th Cir. 2009) (quoting Motor Vehicle , 463 U.S. at 43, 103 S.Ct. 2856 ). "Although nothing more than a 'brief statement' is necessary, the core requirement is that the agency explain 'why it chose to do what it did.' " Tourus Records, Inc. v. Drug Enf't Admin. , 259 F.3d 731, 737 (D.C. Cir. 2001) (citation omitted). "In reviewing that explanation, [the court] must 'consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment.' " Motor Vehicle , 463 U.S. at 43, 103 S.Ct. 2856 (citation omitted).
III. ANALYSIS
Plaintiffs raise various challenges to the Amended Final Order: (1) the NIGC erred as a matter of law when it determined the Tribe timely repudiated the 2002 Agreement and was thus not estopped from asserting that the Restored Lands Exception applied to the Carter Lake Parcel; (2) the NIGC's interpretation of the PRA conflicts with the plain language of the Act; (3) if not, the NIGC's interpretation of the Act is unreasonable; (4) the NIGC should have applied the Part 292 Regulations when conducting its restored lands analysis; and (5) if it was not required to apply the Part 292 Regulations, the NIGC should have considered the 2002 Agreement as a factual circumstance of the trust acquisition.
*1290 The Court will address each argument in turn.
A. Estoppel
The Court first considers the NIGC's analysis of the 2002 Agreement. In Nebraska II , the Eighth Circuit found that "the absence of a determination on the record as to the validity of the agreement entered into between the State of Iowa and the Tribe necessitates remand." 625 F.3d at 511. It added that "[i]f the NIGC concludes that no valid agreement exists estopping the Tribe from raising the 'restored lands' exception, then it may proceed to reexamine whether the Carter Lake land is eligible for gaming under the IGRA's 'restored lands' exception." Id. at 512 (footnote omitted). It specified that "the NIGC should consider the Tribe's contention that it is not bound by the allegedly unauthorized acts of its attorney." Id. at 512 n.9.
On remand, the NIGC determined that the 2002 Agreement was not valid. It found that Mason lacked the requisite authority to bind the Tribe to the agreement and that the State of Iowa failed to satisfy its burden to show that it took the necessary steps to ensure that he had such authority. However, the NIGC found that the Tribe subsequently ratified the agreement, and, through various actions and statements from 2005 to 2007, repudiated the agreement. As part of its repudiation analysis, the NIGC found the State of Iowa did not suffer detrimental reliance on the 2002 Agreement because, at the time the Tribe sought to repudiate the agreement, the State of Iowa could still seek judicial review of the IBIA Trust Decision.
Plaintiffs only challenge the Commission's finding that the 2002 Agreement was timely repudiated, specifically that the State of Iowa suffered no detrimental reliance. See [ECF Nos. 22-1 at 36-37; 50 at 18]. There are four traditional elements of equitable estoppel:
1) the party to be estopped must know the facts; 2) the party to be estopped must intend, or act in a manner that the other party has reason to believe it intends, for its conduct to be acted on; 3) the party asserting estoppel must be ignorant of the true facts; and 4) the party asserting estoppel must rely on the other party's conduct to its injury.
Am. Airlines, Inc. v. United States , 77 Fed.Cl. 672, 679 (Fed. Cl. 2007) ; see also McKee v. Isle of Capri Casinos, Inc. , 864 N.W.2d 518, 531 (Iowa 2015) (citing similar factors).[7] Although the NIGC did not expressly apply these factors, it ultimately concluded that the Tribe was not prevented-i.e., estopped-from repudiating the 2002 Agreement because the State of Iowa suffered no detrimental reliance or injury as a result of the agreement. Cf. Motor Vehicle , 463 U.S. at 43, 103 S.Ct. 2856 ("We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " (citation omitted) ). Plaintiffs note in their briefing that detrimental reliance is used here "as a proxy for promissory estoppel." [ECF No. 50 at 16].
In describing the State of Iowa's reliance interest in the 2002 Agreement, Plaintiffs explain that, immediately following the IBIA Trust Decision, "[t]he State of Iowa had the right to seek federal court review of [that] decision." [ECF No. 22-1 at 17]. However, "Iowa agreed to forego *1291 [sic] judicial review of the fee-to-trust decision in exchange for the Tribe's assertion that the Carter Lake Parcel is not 'restored land.' " Id. This statement implies that, by entering into the 2002 Agreement, the State of Iowa lost its "right to seek federal court review" of the IBIA Trust Decision. But that is not true. As the NIGC found, at the time the Tribe sought to repudiate the agreement, the State of Iowa could still challenge the IBIA Trust Decision because the statute of limitations had not yet run. See 28 U.S.C. § 2401(a).
Plaintiffs do not challenge this proposition, but argue instead that they suffered injury in reliance on the agreement because they believed they had given up their right to bring suit. They argue that, both in 2002 and when the agreement was purportedly repudiated in 2005-2007, it was widely understood that the Quiet Title Act barred APA review of the DOI's decision to acquire land in trust for a Native American tribe once the land was formally acquired. This belief stems from language in the Quiet Title Act's limited waiver of sovereign immunity. It states, in relevant part, "[t]he United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest .... This section does not apply to trust or restricted Indian lands." 28 U.S.C. § 2409a(a).
Contrary to Plaintiffs' claims, it was not settled law that the Quiet Title Act barred APA review of DOI trust decisions, especially in the Eighth Circuit.[8] Clearly, the Government took this view because, as discussed above, federal regulations required the DOI to post notice of a decision to acquire land in trust for a Native American tribe and wait thirty days for potential litigants to seek judicial review before accepting title to the land. See, e.g. , 61 Fed. Reg. at 18082. However, this interpretation of the Quiet Title Act was ultimately incorrect. In 2012, the Supreme Court ruled that the Quiet Title Act's exclusion of disputes involving Native American trust lands only applied to quiet title actions; it did not prevent APA challenges to DOI decisions to acquire land in trust for Native American tribes. See Patchak , 567 U.S. at 228, 132 S.Ct. 2199.
Defendants characterize the State of Iowa's reliance interest as a "mistake of law" and argue that "the general rule [is] that mistake of law is presumptively no[t] [a] sufficient ground of equitable interference."
*1292 Snell v. Atl. Fire & Marine Ins. Co. of Providence, Ill. , 98 U.S. 85, 91, 25 L.Ed. 52 (1878). Plaintiffs rightly point out that there are exceptions to this maxim, notably that "[e]quity will relieve a party from a mistake of law where there is an 'independent equity, as where the mistake is induced, or is accompanied by inequitable conduct of the other party.' " Fidelity & Deposit Co. v. FDIC , 54 F.3d 507, 513 (8th Cir. 1995) (citation omitted). However, in asserting these arguments, both parties miss the mark. In the cases to which the parties cite, litigants suffered concrete injuries because of actions taken in mistaken reliance of the law. See, e.g. , Snell , 98 U.S. at 86-87 (insurance contract applied to only a portion of the cotton for which coverage was sought when the contract mistakenly covered only an individual's interest in the cotton, rather than that of the entire company); Fidelity & Deposit Co. , 54 F.3d at 510-11 (plaintiff paid $ 2.77 million on an appeal bond after mistakenly canceling the letter of credit it had obtained as collateral for the bond). These authorities provide no guidance on the ultimate issue here-whether the mistake in law can also be the injury warranting equitable relief.
The Court finds determinative the fact that the State of Iowa purported to give up a right that it never in fact surrendered. Even if, upon the Tribe's repudiation, the State of Iowa believed that challenging the IBIA Trust Decision would have been futile, courts have rejected such reasoning as a basis for equitable relief. For example, in Menominee Indian Tribe of Wisconsin v. United States , 764 F.3d 51 (D.C. Cir. 2014), aff'd , --- U.S. ----, 136 S.Ct. 750, 193 L.Ed.2d 652 (2016), the United States Court of Appeals for the District of Columbia Circuit considered the Menominee Tribe's argument that equitable tolling applied to its claims against the Indian Health Service ("IHS") for failure to pay certain contract support costs. As one purported example of "extraordinary circumstances" warranting equitable tolling, the tribe pointed to the IHS's "legal position that it was not obligated to pay contract support costs and its pattern of refusals to pay such costs." Id. at 60. The tribe argued that it thus "confronted a legal landscape so bleak that filing a claim would have been 'a fruitless exercise, with no hope of success.' " Id.
The D.C. Circuit rejected this argument. The court held that "[a] party is not excused from timely filing its claim because the agency's view of the law might be inhospitable." Id. at 61. It reasoned, "federal courts ... are the final word on federal law, and '[t]he only sure way to determine whether a suit can be maintained is to try it.' " Id. (alteration in original) (citation omitted). Similarly, the Eighth Circuit has rejected arguments that unfavorable judicial precedents constitute "extraordinary circumstances" that would excuse a litigant from timely filing an action. See E.J.R.E. v. United States , 453 F.3d 1094, 1098 (8th Cir. 2006).
The Court is mindful that the detrimental reliance requirement for equitable estoppel is not the same as the extraordinary circumstances requirement for equitable tolling. However, regarding detrimental reliance, "the injury or prejudice involved must be actual and substantial, and not merely technical or formal." 4 Am. Jur. Proof of Facts 2d 641, Detrimental Reliance on Promise (1975); accord State v. Raymond , 254 Iowa 828, 119 N.W.2d 135, 140 (1963). Given that the State of Iowa retained its right to challenge the IBIA Trust Decision-notwithstanding its view that the challenge would be futile-the Court finds the NIGC did not err as a matter of law in concluding that the State of Iowa suffered no detrimental reliance on *1293 the 2002 Agreement. Absent such reliance, the NIGC appropriately found the Tribe was not estopped by the 2002 Agreement from asserting that the Carter Lake Parcel qualified for the Restored Lands Exception.
B. Interpretation of the PRA
As discussed above, the IGRA generally prohibits gaming activities on land acquired in trust by the United States on behalf of a tribe after October 17, 1988. 25 U.S.C. § 2719(a). One exception permits gaming activity on land that is acquired in trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." Id. § 2719(b)(1)(B)(iii). Plaintiffs argue that the plain language of the PRA limits "restored lands" to property acquired in trust for the Tribe located in Knox or Boyd Counties, Nebraska. The NIGC disagreed, finding that the PRA contains no such limitation. This issue is significant: if the PRA restricts restored lands to property located in Knox and Boyd Counties, the Carter Lake Parcel, located in Pottawattamie County, Iowa, cannot qualify for the Restored Lands Exception.
When reviewing an agency's interpretation of a statute, federal courts conduct a two-part inquiry. "First, always, is the question whether Congress has directly spoken to the precise question at issue." Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc. , 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Courts employ "traditional tools of statutory construction" to make this determination. Id. at 843 n.9, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778. If statutory analysis does not clearly resolve textual ambiguity, then courts proceed to Chevron step two. There, "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs. , 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).
The disputed provision appears in section 4(c) of the Act. It provides:
The Secretary shall accept not more than 1,500 acres of any real property located in Knox or Boyd Counties, Nebraska, that is transferred to the Secretary for the benefit of the Tribe. Such real property shall be accepted by the Secretary ... in the name of the United States in trust for the benefit of the Tribe .... The Secretary may accept any additional acreage in Knox or Boyd Counties pursuant to his authority under the [IRA]....
25 U.S.C. § 983b. Looking solely at the statutory language, this provision requires the Secretary to accept the transfer of land in Knox or Boyd Counties, Nebraska, for the benefit of the Tribe. The Secretary is only required to accept 1,500 acres of such land. The Secretary need not actively acquire the land, but he must accept it if offered. The Secretary may, but need not, accept more land in these counties pursuant to his authority under the IRA.
As is immediately apparent, section 4(c) makes no reference to restored lands. The term does not appear in the Act. The term is incorporated-indirectly-via section three of the Act, which reads, "[a]ll Federal laws of general application to Indians and Indian tribes (including the [IRA] ) shall apply with respect to the Tribe and to the members." 25 U.S.C. § 983a. The parties do not dispute that the IGRA is a *1294 "Federal law[ ] of general application to Indians and Indian tribes." However, although the IGRA both prohibits gaming activities on Native American trust lands acquired after October 17, 1988, and allows for the Restored Lands Exception, it does not set out a test for determining when the exception applies, nor does it otherwise define restored lands. Thus, the Act's reference to the IGRA does not clarify Congress's intent as to whether the Act limits restored lands to property in Knox and Boyd Counties.
The legislative history is similarly unhelpful. It does, however, signal that Congress's key concern in requiring the Secretary to accept land in Knox and Boyd Counties was twofold: (1) to ensure that a minimum amount of land was set aside for the Tribe while; (2) preserving generally the Secretary's discretion over trust lands. The Act first emerged from the Senate, where section 4(c) required the Secretary "to accept any land transferred to the Secretary in trust in the name of the United States for the benefit of the Tribe." S. Rep. No. 101-330 at 3 (1990) (emphasis added). At the recommendation of the DOI, the House Committee on Interior and Insular Affairs struck that language and added the provisions in section 4(c) requiring the Secretary to accept in trust 1,500 acres in Knox and Boyd Counties, and reiterating the Secretary's discretion to take additional lands into trust.
In explaining those respective amendments, the committee reported that the first amendment "limits the geographical area within which the Secretary can accept land in trust to two Nebraska counties. It also limits the acreage to 1,500 acres. The second amendment makes it clear that, after the 1,500 acres are taken in trust, the Secretary has the discretion to take additional land in trust for the Tribe." H.R. Rep. No. 101-776, at 4 (1990). This tension between mandatory trust lands and the Secretary's discretion is also reflected elsewhere in the congressional record. In advocating for the passage of the Act, Doug Bereuter, former representative of Nebraska's first congressional district, explained that, in lieu of reservation status for lands acquired in trust for the Tribe, the Act "permits the tribe to acquire 1,500 acres of land for economic development, agricultural, and ceremonial and tribal purposes." 136 Cong. Rec. 9,279 (1990). He added, "[b]eyond that, the Secretary of the Interior will have the discretion, as he does currently for all other federally recognized tribes, to acquire additional lands to be designated as trust lands on behalf of the tribe." Id.
As it appears Congress did not intend to limit the Secretary's ability to acquire additional lands in trust for the Tribe, it is notable that the Act articulates only one limitation on the rights that accrue to the Tribe by virtue of those lands being held in trust-such lands shall not be granted reservation status. 25 U.S.C. § 983b(e). It seems unlikely that Congress would have intended additional limitations of such rights without expressly stating them. This observation is bolstered when considering the restoration acts of other Native American tribes, pre-dating the PRA, in which Congress expressly limited the lands the Secretary could take into trust or prohibited gaming on them unless otherwise allowed under applicable state law. See Grand Ronde Restoration Act, Pub. L. No. 98-165, § 8(c)(3), 97 Stat. 1064 (1983) ("[T]he Secretary shall not accept any real property in trust for the benefit of the tribe or its members which is not located within the political boundaries of Polk, Yamhill, or Tillamook County, Oregon."); Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L No. 100-89, § 107(a), 101 Stat. 666 (1987) ("All gaming activities *1295 which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe."). It is also notable that the PRA's denial of reservation status is discussed in the legislative history cited above. See H.R. Rep. No. 101-776, at 4 ; 136 Cong. Rec. 9,279. It is not necessary to detail those discussions here, but they stand in stark contrast to Congress's silence on gaming and restored lands status.
Given the Act's broad incorporation of "Federal laws of general application to Indians and Indian tribes," and Congress's clear intent to encroach only minimally on the Secretary's discretion in dealing with Native American tribes, the reasonable conclusion is that Congress was content to let the Secretary deal with the issue of restored lands if it ever arose. However, the Court's task in the first step of the Chevron analysis is to determine whether the plain language of the Act shows Congress's clear intent to limit restored lands to those held in trust for the Tribe in Knox and Boyd Counties. For the reasons set out above, the Court finds it does not.
Turning to the second part of the Chevron analysis, the Court considers whether the NIGC's interpretation of the Act was "reasonable." Brand X Internet Servs. , 545 U.S. at 980, 125 S.Ct. 2688. As noted above, the NIGC found the PRA does not limit the designation of restored lands to property located within Knox and Boyd Counties. See [ECF No. 18-3 at 30]. In making that determination, the NIGC adopted the PRA Opinion, which reached the same conclusion after a detailed analysis. See id. As a matter of Chevron deference, and for the reasons summarized in the preceding paragraph, the Court finds the NIGC's interpretation is entirely reasonable.
Plaintiffs object, however, to the procedure whereby the Commission interpreted the PRA. They argue the NIGC's interpretation was arbitrary and capricious because it failed to consider the persuasive effect of the Part 292 Regulations. Those regulations set out factors the DOI and NIGC presently consider in a restored lands analysis. Plaintiffs believe the NIGC's determination that the PRA does not limit restored lands to property in Knox and Boyd Counties conflicts with those regulations. The pertinent regulation states, in relevant part:
(a) If the tribe was restored by a Congressional enactment of legislation recognizing, acknowledging, affirming, reaffirming, or restoring the government-to-government relationship between the United States and the tribe, the tribe must show that either:
(1) The legislation requires or authorizes the Secretary to take land into trust for the benefit of the tribe within a specific geographic area and the lands are within the specific geographic area; or
(2) If the legislation does not provide a specific geographic area for the restoration of lands, the tribe must meet the requirements of § 292.12.
25 C.F.R. § 292.11. In response to public comments during the rule-making process, the DOI explained, "[t]he regulations include a contingency for legislation that requires or authorizes the Secretary to take land into trust for the benefit of a tribe within a specific geographic area because in such scenarios, Congress has made a determination which lands are restored." Gaming on Trust Lands Acquired after October 17, 1988, 73 Fed. Reg. 29354-01, at 29364 (May 20, 2008). Plaintiffs interpret § 292.11 as requiring the DOI to find that the Tribe's restored lands are limited to those the PRA "requires or authorizes" the Secretary to take into trust, namely those in Knox and Boyd Counties.
*1296 The Court stresses that § 292.11 interprets the IGRA, not the PRA.
The Court must consider whether § 292.11 was a relevant factor that the NIGC should have considered when interpreting the PRA. Through incorporation of the PRA Opinion, the NIGC considered numerous factors that are well-established tools of statutory construction, including: (1) the text of the PRA; (2) its legislative history; (3) the purposes of the statute; (4) the interaction between section 4(c) and other provisions of the Act; and (5) relevant language, for the purposes of comparison, in similar statutes. Plaintiffs do not cite, and the Court is not aware of, any authority that would include among these tools an agency's interpretation of a different statute or, more specifically, an agency rule that purports to impose a particular approach to statutory construction regardless of the specific text and circumstances of the statute in question.
Even if agency rules or interpretations should be added to the canons of statutory construction in this manner, § 292.11 is a poor candidate. If Plaintiffs' reading of the regulation is correct, it would impose a determination as to the meaning of a statute based on one provision only-a provision authorizing or requiring the Secretary to take specified lands into trust for a tribe. As persuasive authority, the regulation would give outsize importance to that provision because of an agency's approach , rather than the statutory text or other factors indicating Congress's intent. It is not clear what bearing an agency's approach, in the abstract, has on the meaning of a statute drafted by Congress. Accordingly, the NIGC correctly disregarded § 292.11 when interpreting the PRA.[9]
C. Restored Lands Analysis
1. Applicability of the Part 292 Regulations
Plaintiffs argue the NIGC erred in not applying the Part 292 Regulations when conducting its restored lands analysis. As was customary prior to the implementation of those regulations, the NIGC analyzed the Grand Traverse II factors: (1) the factual circumstances of the trust acquisition; (2) the location of the acquisition; and (3) the temporal relationship between the acquisition and the tribe's restoration.
In deciding to apply the common law, rather than the Part 292 Regulations, the NIGC analyzed and applied the regulations' grandfather provision. It states:
These regulations apply to all requests pursuant to 25 U.S.C. 2719, except:
(a) These regulations do not alter final agency decisions made pursuant to 25 U.S.C. 2719 before the date of enactment of these regulations.
(b) These regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw or modify such opinions.
*1297 25 C.F.R. § 292.26. The NIGC found that both grounds in the grandfather provision were applicable. With respect to subsection (a), the Commission reasoned that the 2007 Final Order was issued before the Part 292 Regulations went into effect. See [ECF No. 18-3 at 32]. The Commission added that, although the district court vacated that decision on review, the Eighth Circuit reversed the district court and remanded the case back to the NIGC for further proceedings. Id. This, the Commission reasoned, preserved the "final" status of the 2007 Final Order. Id. As to subsection (b), the NIGC found it was applicable because the Gross Memorandum, upon which the Chairman's Decision relied, was also issued before the Part 292 Regulations went into effect. Id. at 33. The Commission found that the Gross Memorandum "continues in effect, subject to 'full discretion to qualify, withdraw or modify such opinion[ ].' " Id. (alteration in original) (quoting 25 C.F.R. § 292.26(b) ).[10]
An agency's interpretation of its own regulations is ordinarily controlling. Auer v. Robbins , 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Such deference is warranted, however, only when the language of the regulation is ambiguous. Northshore Mining Co. v. Sec'y of Labor , 709 F.3d 706, 709 (8th Cir. 2013). Even then, deference is inappropriate where: (1) the interpretation is "plainly erroneous or inconsistent with the regulation"; or (2) "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.' " Christopher v. SmithKline Beecham Corp. , 567 U.S. 142, 155, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012) (citations omitted). Such suspicion may arise when "the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a 'convenient litigating position,' or a ' "post hoc rationalization[n]" advanced by an agency seeking to defend past agency action against attack.' " Id. (alteration in original) (citations omitted).
Looking to the plain language of the regulation, § 292.26 does not address how the Part 292 Regulations should apply when a final agency decision, issued before the effective date of the regulations, is remanded back to the Commission for further consideration. The regulations do not define "final agency decisions" or "written opinion" such that the terms dictate the correct approach. The Court finds the grandfather provision is ambiguous as to remanded decisions. The Secretary has effectively admitted this by applying both the common law restoration test and the Part 292 Regulations in a case where this situation arose. See Butte Cty. v. Chaudhuri , 887 F.3d 501, 508 (D.C. Cir. 2018). In Chaudhuri , the Secretary reasoned, and the circuit court agreed, that the outcome was the same under either approach. Id. Thus, when this precise issue arose in the past, the Secretary avoided it altogether.
DOI comments during the rule-making process do not address this precise issue, *1298 but they do show a concern over parties having relied on agency actions or opinions that appear to be void under the new regulations. Regarding the grandfather provision, the DOI explained:
During the course of implementing IGRA section 20, the Department and the NIGC have issued a number of legal opinions to address the ambiguities left by Congress and provide legal advice for agency decisionmakers, or in some cases, for the interested parties facing an unresolved legal issue. These legal opinions typically have been issued by the Department's Office of the Solicitor or the NIGC's Office of General Counsel. In some cases, the Department or the NIGC subsequently relied on the legal opinion to take some final agency action. In those cases, section 292.26(a) makes clear that these regulations will have no retroactive effect to alter any final agency decision made prior to the effective date of these regulations. In other cases, however, the Department or the NIGC may have issued a legal opinion without any subsequent final agency action. It is expected that in those cases, the tribe and perhaps other parties may have relied on the legal opinion to make investments into the subject property or taken some other actions that were based on their understanding that the land was eligible for gaming. Therefore, section 292.26(b) states that these regulations also shall not apply to applicable agency actions taken after the effective date of these regulations when the Department or the NIGC has issued a written opinion regarding the applicability of 25 U.S.C. 2719 before the effective date of these regulations. In this way, the Federal Government may be able to follow through with its prior legal opinions and take final agency actions consistent with those opinions, even if these regulations now have created a conflict.
73 Fed. Reg. at 29372. The Court finds the NIGC's interpretation of § 292.26 is not clearly erroneous or inconsistent with the regulation. Section 292.26 states that the Part 292 Regulations will not "alter final agency decisions made ... before the date of enactment of these regulations. 25 C.F.R. § 292.26(a). Although neither party argues that the 2007 Final Order should be altered because of the Part 292 Regulations alone, there is a clear intent to limit the "retroactive effect" of the regulations. 73 Fed. Reg. at 29372. Declining to apply the Part 292 Regulations when reconsidering a final agency decision issued before their effective date is consistent with the broad aims of the grandfather provision.
Additionally, it is undisputed that the Gross Memorandum is "a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for a particular gaming establishment." 25 C.F.R. § 292.26(b). However, Plaintiffs argue it cannot qualify as a "written opinion" under the grandfather provision because it determined the Carter Lake Parcel did not qualify as restored lands. That is a narrow reading of § 292.26, and the Commission did not err in taking a broader view. The Gross Memorandum was based on the law pre-dating the Part 292 Regulations, and the instant lawsuit is the continuation of a dispute over that opinion's accuracy. During that dispute, the Commission has twice approved the Tribe's site-specific ordinance, on which the Tribe and others could rely (notwithstanding judicial challenges). Further, as is evident from the Amended Final Order, the Commission continued to exercise its "full discretion to qualify, withdraw or modify" the conclusions in the Gross Memorandum. The Commission's finding that the Gross Memorandum is a "written opinion" was consistent with the text and aims of the grandfather provision, *1299 not otherwise inconsistent with § 292.26, and not clearly erroneous.
In sum, the Court finds the NIGC did not violate the APA when it determined that the Part 292 Regulations were inapplicable to the present dispute.
2. 2002 Agreement as a factual circumstance
Plaintiffs also argue the NIGC erred when it failed to consider the 2002 Agreement as a "factual circumstance[ ] of the [trust] acquisition" when conducting its restored lands analysis. Grand Traverse II , 198 F.Supp.2d at 935. Defendants argue that when the Eighth Circuit remanded this case back to the NIGC, its instructions only required the Commission to consider the 2002 Agreement with respect to the threshold issue of estoppel.
In Nebraska II , the DOI and NIGC asked the Eighth Circuit, among other things,
to permit the NIGC, in consultation with the DOI, to weigh the three factors that are relevant to the determination of whether the Carter Lake land is eligible for gaming under the IGRA's 'restored lands' exception-temporal proximity, historical and modern connection to the location and the factual circumstances of the trust acquisition, including the Tribe's purported agreement with the State of Iowa as memorialized in the Corrected Notice.
625 F.3d at 508. In light of this request, the Eighth Circuit framed the ultimate issue as
whether the NIGC's decision that the Carter Lake land constitutes "restored lands" under 25 U.S.C. § 2719(b)(1)(B)(iii) is arbitrary, capricious, an abuse of discretion, or not in accordance with the law. But the DOI and NIGC have further narrowed the appeal by expressly declining to contest the district court's holding that the NIGC Commission improperly excluded from consideration the purported agreement between the Tribe and State of Iowa as set forth in the Corrected Notice. According to the DOI and NIGC, such a holding does not resolve the issue of whether the Carter Lake land is eligible for gaming under the IGRA's restored lands exception because the NIGC, in consultation with the DOI, must determine what legal effect and weight to give the purported agreement and Corrected Notice.
Id. at 509 (emphasis added). It is clear from this framing that the Eighth Circuit viewed the validity and effect the 2002 Agreement and Corrected Notice as factors to be considered in a restored lands analysis. As further proof of this, the Eighth Circuit discussed the Grand Traverse II factors before turning to "the only remaining question" of "whether a remand is necessary in light of the DOI and NIGC's concession that the NIGC improperly excluded from consideration the purported agreement between the Tribe and the State of Iowa referenced in the Corrected Notice." Id. at 511.
The Eighth Circuit concluded "that the absence of a determination on the record as to the validity of the agreement entered into between the State of Iowa and the Tribe necessitates remand." Id. The court declined to address the issue itself, finding that "the record [was] inadequate to make a conclusive determination as to the Corrected Notice's validity as an agreement and its legal effect." Id. at 512.
The Eighth Circuit then gave a specific instruction that appears to have caused the present confusion: "[i]f the NIGC concludes that no valid agreement exists estopping the Tribe from raising the 'restored lands' exception, then it may proceed to reexamine whether the Carter *1300 Lake land is eligible for gaming under the IGRA's 'restored lands' exception." Id. (footnote omitted). The NIGC appears to have focused exclusively on this instruction. When describing its task on remand, the NIGC said, "we must determine whether the agreement is valid. If it is, we must assess the impact of the agreement for purposes of the factual circumstances factor of the restored lands analysis." [ECF No. 18-3 at 9-10] (footnote omitted). As already discussed, the NIGC concluded that the agreement was not valid and the Tribe was not estopped from asserting restored lands status over the Carter Lake Parcel. The parties agree that the NIGC did not consider the 2002 Agreement in its restored lands analysis.
The Court cannot fault the NIGC for treating estoppel as a threshold issue. That instruction was clear. However, focusing solely on that instruction distorts the Eighth Circuit's consideration of the NIGC's restored lands analysis, particularly in the context of the agencies' concessions on appeal. The Eighth Circuit's estoppel instruction speaks to the possibility that a restored lands analysis would be unnecessary if the Tribe was estopped from asserting the Restored Lands Exception. The Eighth Circuit gave no express guidance as to what should be included in a restored lands analysis should it be necessary. In that regard, the Eighth Circuit instructed only that the NIGC "reconsider[ ] ... its restored lands analysis in accordance with this opinion." Id. at 513. The Court finds the NIGC failed to do so.
The district court in Nebraska I found that the NIGC's 2007 Final Order was arbitrary, contrary to law, and invalid-in relevant part-because it failed to consider the 2002 Agreement in its restored lands analysis. The court drew a sharp contrast between the Gross Memorandum, which weighed the 2002 Agreement in its analysis, and the 2007 Final Order. It considered the Gross Memorandum to be "well-reasoned" and "very well documented." Nebraska I , slip op. at 9-10 (Nov. 28, 2008), ECF No. 56. On the other hand, the district court found that "[t]he three NIGC Commissioners' decision rejected counsel's and its Chairman's initial conclusion about the facts surrounding the Carter Lake conveyance in trust, holding without adequate explanation that 'the Chairman erred in relying on events that occurred after DOI's decision was final.' " Id. at 10. The court explained:
But those events were crucial to the completion of the conveyance: they included the deal the Ponca Tribe made with Iowa; the Iowa decision not to challenge the conveyance by judicial review; the public notice disavowing restored land status and gaming on the Carter lake parcel; and the Secretary's execution of the deed in trust in February 2003.
Id.
On appeal, the DOI and NIGC did not challenge this finding, but argued only that the district court should have remanded the case so that the NIGC could consider the weight and legal effect of the 2002 Agreement and Corrected Notice in its restored lands analysis. The Eighth Circuit agreed. Thus, although the NIGC was required to consider the validity of the 2002 Agreement in the context of estoppel, the Commission was also still required to conduct the analysis that it failed to do in 2007. Here, having failed to consider relevant factors in its restored lands analysis, the NIGC's conclusion based on that analysis is arbitrary and capricious.
Because the NIGC has still not determined, on the record, the impact of the 2002 Agreement and Corrected Notice on the Carter Lake Parcel's status as restored *1301 lands, this matter must be remanded to the Commission for further consideration. See Nebraska II , 625 F.3d at 511-12 (finding that the "absence of a determination on the record" as to the validity of the 2002 Agreement necessitates remand); Mayo v. Ashcroft , 317 F.3d 867, 874 (8th Cir. 2003) (explaining that the "ordinary remand rule" means "a court of appeals, except in rare circumstances, 'should remand a case to an agency for decision of a matter that statutes place primarily in agency hands' " (citation omitted) ).
In the Amended Final Order, the NIGC considered the validity of the 2002 Agreement and its legal impact, although only in the narrow context of estoppel. On remand, rather than such broad concepts touching on the agreement itself, the NIGC must consider the facts and circumstances surrounding the agreement as part of its restored lands analysis. As the district court found in Nebraska I -and Defendants conceded on appeal-"those events were crucial to the completion of the conveyance" of the Carter Lake Parcel. As to how crucial they were, and how they balance against other factual, temporal, and geographic factors, the Court leaves that determination to the NIGC. To the extent the Commission needs a clearer guide as to what must be considered on remand, it need look no further than the Gross Memorandum. There, Associate General Counsel Gross considered numerous factual circumstances surrounding the 2002 Agreement. The NIGC is not bound by his conclusions, and it may consider additional factors regarding the agreement that it considers relevant. To the extent those factors include conclusions the NIGC reached in its estoppel analysis in the Amended Final Order, the Commission need not repeat the analysis it undertook to reach those conclusions; instead, it is enough to explain why those factors are or are not relevant.
IV. CONCLUSION
For the foregoing reasons, Plaintiffs' Motion for Summary Judgment, [ECF No. 22], is GRANTED in part and DENIED in part. Defendants' Motion for Summary Judgment, [ECF No. 35] is DENIED. This matter is ORDERED REMANDED to the NIGC for reconsideration of its restored lands analysis. The Commission shall evaluate the 2002 Agreement and the Corrected Notice as factual circumstances of the trust acquisition in accordance with this Order.
Plaintiffs may file a motion and brief by April 9, 2019, seeking costs and reasonable attorney's fees, as requested in their Complaints. If that motion is filed, Defendants may respond in writing by April 23, 2019.
IT IS SO ORDERED.

The factual background is drawn from the administrative record of the NIGC's 2007 decision involving gaming on the Carter Lake Parcel, and its more recent 2017 decision giving rise to the instant litigation. The 2007 administrative record is docketed at ECF. Nos. 19-2 through 19-5, and the 2017 administrative record is docketed at ECF Nos. 18-3 through 18-6.

"Non-banking card games are games played against other players, as opposed to banking card games, which are played against the house." United States v. Sisseton-Wahpeton Sioux Tribe , 897 F.2d 358, 360 n.3 (8th Cir. 1990)

The United States currently "recognizes" almost 600 Native American tribes. See U.S. Dep't of the Interior, Federal and State Recognized Tribes , http://www.ncsl.org/research/state-tribal-institute/list-of-federal-and-state-recognized-tribes.aspx (last updated Nov. 2018). As part of that recognition, the United States acknowledges the sovereignty of those tribes. See Federally Recognized Indian Tribe List Act of 1994, PL 103-454, § 103, 108 Stat 4791 (Nov. 2, 1994). Thus, as it would with a foreign sovereign entity, the United States interacts with recognized tribes through their tribal governments, rather than through tribal members individually. Cf. Statement of Policy on Establishing a Government-to-Government Relationship with Indian Tribes , Policy Statement, 16 F.C.C.R. 4078, 4080 (2000) (defining "Tribal Governments" as "the recognized government of an Indian Tribe that has been determined eligible to receive services from the Department of Interior, Bureau of Indian Affairs").

In an effort to "free Indians from dependency on federal programs," the federal government, in 1953, adopted a policy of "termination" of Native American Tribes. H.R. Rep. No. 101-776, at 3 (1990). "Termination ended the special trust relationship between certain tribal governments and the United States, subjected tribes to state law, and, ultimately, converted tribal land to private ownership." Id. Congress terminated its recognition of the Tribe under this policy. See id.

In 2012, Faegre & Benson LLP merged with Baker & Daniels LLP to form Faegre Baker Daniels LLP.

25 C.F.R. § 292.12 lists various criteria that the tribe must satisfy related to its connection to the land in question.

The parties do not specify whether Iowa or federal contract law applies to the 2002 Agreement. However, given the similarities between the tests for equitable estoppel under the two bodies of law, especially the reliance factor, the Court finds the choice of law does not impact its analysis.

There was non-binding appellate authority supporting the State of Iowa's interpretation of the Quiet Title Act. The United States Courts of Appeals for the Ninth, Tenth, and Eleventh Circuits construed the Quiet Title Act's sovereign immunity waiver as barring all suits involving the United States' title to land acquired in trust for Native American tribes, regardless of whether the plaintiff claimed an ownership interest in the disputed property. See Neighbors for Rational Dev., Inc. v. Norton , 379 F.3d 956, 965 (10th Cir. 2004) ; Metro. Water Dist. of S. Cal v. United States , 830 F.2d 139, 143-44 (9th Cir. 1987) ;Fla. Dep't of Bus. Reg. v. U.S. Dep't of Interior , 768 F.2d 1248, 1254-55 (11th Cir. 1985). It cannot be said, however, that this was a uniform approach. For example, the United States District Court for the District of Columbia found that the Quiet Title Act barred only quiet title actions involving land taken into trust for Native American tribes. See City of Sault Ste. Marie v. Andrus , 458 F.Supp. 465, 471-72 (D.D.C. 1978). The Eighth Circuit appears to have only considered the Quiet Title Act's waiver of sovereign immunity in the context of quiet title actions. See, e.g. , Ducheneaux v. Sec'y of the Interior , 837 F.2d 340 (8th Cir. 1988) ; Spirit Lake Tribe v. North Dakota , 262 F.3d 732 (8th Cir. 2001). However, although only in dicta, the Eighth Circuit expressed doubt in one case over "whether the Quiet Title Act precludes APA review of agency action by which the United States acquires title." South Dakota v. U.S. Dep't of Interior , 69 F.3d 878, 881 n.1 (8th Cir. 1995), judgment vacated and case remanded by 519 U.S. 919, 117 S.Ct. 286, 136 L.Ed.2d 205 (1996).

The Court is aware of the alleged incongruity between the NIGC's interpretation of the PRA and the apparent result, in Plaintiffs' view, of the restored lands analysis that would follow from the Part 292 Regulations. Assuming Plaintiffs' interpretation of § 292.11 is correct, this speaks more to the faults of § 292.11 than it does the NIGC's interpretation of the Act.

The Court rejects Plaintiffs' argument that "the NIGC's failure to explain why it does not apply the regulations other than through invoking the grandfather clause is arbitrary and capricious." [ECF No. 22-1 at 33]. The Commission was only required to "explain 'why it chose to do what it did.' " Tourus Records, Inc. , 259 F.3d at 737. It was not, as Plaintiffs maintain, required to explain why it did not take some alternative course of action. In its decision, the NIGC explained that it would apply the common law restored-lands factors because it found that the Part 292 Regulations' grandfather provision applied on the facts of this case. It discussed both subsections of the grandfather provision and explained why it believed each applied. Provided its decision to apply the common law was correct, the Commission was not required to do more.